In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3595

AMBER PARKER, et al.,

*Plaintiffs-Appellants,*

*v.*

FRANKLIN COUNTY COMMUNITY SCHOOL
CORPORATION, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-885-WTL-WGH—**William T. Lawrence**, *Judge.*

ARGUED MAY 31, 2011—DECIDED JANUARY 31, 2012

Before EASTERBROOK, *Chief Judge,* and WOOD and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* A packed gymnasium, cheer-
leaders rallying the fans, the crowd on their feet sup-
porting their team, and the pep band playing the school
song: these are all things you might expect to see at an
Indiana high school basketball game on a Friday night. The
crowd becomes part of the game; they provide motiva-

tion, support, and encouragement to the players. After all, what would a spectator sport be without the spectators? Unfortunately, this is a question the Franklin County High School girls' basketball teams must answer every season because half their games have been relegated to non-primetime nights (generally Monday through Thursday) to give preference to the boys' Friday and Saturday night games. Non-primetime games result in a loss of audience, conflict with homework, and foster feelings of inferiority. The question we're asked to decide in this appeal is whether such discriminatory scheduling practices are actionable under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). We think the plaintiffs have presented a genuine question of fact that such practices violate the statute, and therefore we vacate the district court's entry of summary judgment in favor of the defendants on this claim. We further vacate the district court's dismissal of the plaintiffs' equal protection claim, brought pursuant to 42 U.S.C. § 1983, on the basis of sovereign immunity. The defendants are "persons" within the meaning of § 1983, and thus, subject to suit under that statute.

## I. Background

Amber Parker brought this suit on behalf of her minor daughter J.L.P. against fourteen Indiana public school corporations. Parker served as head coach of the girls' varsity basketball team at Franklin County High School, part of Defendant Franklin County Community School

Corp., from 2007 to 2009. J.L.P. was a member of that team during the 2008-2009 season. After the Parker family moved out of state, Tammy Hurley filed an identical suit on behalf of her minor daughter C.H., who was a current member of the Franklin's girls' varsity basketball team. Hurley was eventually added as a plaintiff in the present lawsuit; Parker remains a plaintiff as well. The defendants in this suit include Franklin and conference and non-conference school districts that agreed by contract to play the Franklin girls' basketball team during the 2009-2010 season.

The girls' basketball season starts two weeks before the boys' and during this time, the girls' games are scheduled for primetime nights. Primetime is defined as evenings that precede days without school. The record reveals that at those weekend games, there "are large crowds in attendance . . ., substantial student and community support in the stands, and the presence of the band, cheerleaders, and dance teams." When the boys' basketball season starts two weeks later, the girls are relegated to playing most of their games on week nights. At those games, the atmosphere is dramatically different. The girls lose the larger Friday night audience, pep band, cheerleaders, and dance team. The bleachers are nearly deserted; there is a lack of student and community support. The girls struggle to complete their homework and study for tests, and the scheduling policy affected J.L.P.'s grades during the season. J.L.P. also attested that the defendants' practice of placing girls' games disproportionately in non-primetime slots made her feel like girls' accomplishments are less important than boys'.

The plaintiffs named fourteen school defendants in this action: six comprise the schools within the Eastern Indiana Athletic Conference (EIAC) (Franklin County Community School, Batesville Community School, Sunman-Dearborn Community School (East Central), Greensburg Community Schools, Lawrenceburg School Community, and South Dearborn Community School); the others are not members of that conference (Decatur County Community Schools, Switzerland County School, Fayette County School, Richmond Community Schools, Jennings County School, Rush County Schools, Union County School/College Corner Joint School District, and Muncie Community Schools). The EIAC makes decisions by majority rule and voted to enter into two- to four-year contracts for the scheduling of games. Franklin plays each of the conference schools twice a season, once at home and once away. Franklin plays the non-conference schools once a season and they alternate annually between home and away.

During the 2009-2010 basketball season, nearly 95 percent of the Franklin boys' varsity basketball games, but less than 53 percent of the Franklin girls' games, were played in primetime. During the 2007-2009 seasons, the disparity was 95 percent to 47 percent, respectively. In April 2007, Parker asked Franklin Athletic Director Beth Foster to allow the girls' basketball team to play games in primetime on an equal basis with the boys' team. Foster responded that the dates, times, and locations of the basketball games were all governed by contracts for either a two- or four-year period, and once defendants' athletic directors agreed to a schedule and signed a con-

tract, the schools generally would maintain those same game days and times in subsequent years.

Foster testified that she has attempted to increase the number of girls' basketball games played in the primetime spots, but athletic directors in the EIAC have refused. Foster was met with resistance from the other school athletic directors in the EIAC when she attempted to address gender equity. She even tried to get double headers on Friday nights, but three of the athletic directors wouldn't agree. Foster testified that she is trying hard to make it more equal. She said that she "can't get there because [she] can't get anybody to come play us on those nights," and she can't dictate what night the games will be played.

## II. Discussion

The defendants moved for summary judgment on both Parker's section 1983 equal protection claim and Title IX claim, and Parker filed a cross-motion for summary judgment. Before the district court ruled on the parties' motions for summary judgment, Hurley, on behalf of her minor daughter C.H., was added as a plaintiff and joined in all claims. The district court granted the defendants' motion for summary judgment on the plaintiffs' 1983 claims on the basis that the defendants were arms of the state and thus, entitled to sovereign immunity under the Eleventh Amendment. The court subsequently granted the defendants' motion for summary judgment on the plaintiffs' Title IX claims upon finding as a matter of law that the defendants' treatment

of the plaintiffs did not result in a disparity so substantial that it denied the plaintiffs equality of athletic opportunity.

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Cross-motions for summary judgment do not waive the right to a trial; rather, we treat the motions separately in determining whether judgment should be entered in accordance with Rule 56. *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

Before diving into the merits, we first address defendants' argument that Parker's claims are moot because her daughter is no longer a student at Franklin. Parker's injunctive claims are moot; however, her claims for compensatory damages remain alive. *See, e.g., Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009) (federal prisoner claim for injunctive relief rendered moot when he transferred prisons but his claim for damages for past infringements of his constitutional rights remained); *see also Pederson v. La. State Univ.*, 213 F.3d 858, 875 (5th Cir. 2000) (Title IX claim not rendered moot by student's graduation where she asserted claims for monetary damages).

## A. Title IX Claim

Since the enactment of Title IX, there has been a huge increase in the number of females participating in high school athletic programs. Before its enactment, less than 300,000 girls participated in high school athletic programs (approximately one in twenty-seven), compared to 3.6 million boys. See National Federation of State High School Associations, Participation Survey Results for 1971-1972, http://www.nfhs.org/content.aspx?id=3282 (last visited Jan. 26, 2012). Girls' participation has increased dramatically since 1971 and is increasing faster than boys'; in 2009-2010, 3.2 million girls participated in sports (more than a 50,000 increase from the previous year), and 4.5 million boys participated (less than a 35,000 increase from the previous year). *Id.* The impact of Title IX on student athletes is significant and extends long beyond high school and college; in fact, numerous studies have shown that the benefits of participating in team sports can have life-long positive effects on women. *See* Dionne L. Koller, *Not Just One of the Boys: A Post-Feminist Critique of Title IX's Vision for Gender Equity in Sports*, 43 Conn. L. Rev. 401, 413 (2010) ("[S]tudies have shown that sports participation provides important lifetime benefits to participants" such as "discipline, teamwork, time man-agement, and leadership that further long-term per-sonal growth, independence and wellbeing" and "better physical and mental health, higher self-esteem, a lower rate of depression, and positive body image, as well as the development of responsible social behaviors, greater educational success, and inter-personal skills") (quota-tions omitted). Conversely, discriminating against female

athletes and creating feelings of inferiority with their male counterparts can have long-lasting negative effects. *See Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 178 F. Supp. 2d 805, 837-38 (W.D. Mich. 2001), *aff'd*, 377 F.3d 504 (6th Cir. 2004), *judgment vacated on other grounds*, 544 U.S. 1012 (2005), *aff'd on remand*, 459 F.3d 676, 695 (6th Cir. 2006).

Title IX has gone a long way in changing society's view of female athletes by providing females with the opportunity to showcase their athletic ability and competitiveness and encouraging female participation and interest in sports. The progress in women's athletics has sparked a "realization by many that women's sports [can] be just as exciting, competitive, and lucrative as men's sports." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999). "Title IX has enhanced, and will continue to enhance, women's opportunities to enjoy the thrill of victory, the agony of defeat, and the many tangible benefits that flow from just being given a chance to participate in . . . athletics." *Id.*

Although Title IX has gone a long way in increasing the status and respect for female athletes, discrimination endures. Title IX has not ended the long history of discrimination against females in sport programs; many educational institutions continue to place male sport programs in a position of superiority. *See McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 296 (2d Cir. 2004) ("Despite substantial progress in attitudes about women and sports, the competitive accomplishments of male athletes may continue to be valued more than the

achievements of female athletes."). This is likely due in part because a majority of litigation under Title IX has focused on "accommodation" claims where plaintiffs assert that schools have failed to establish athletic programs to meet the interests and abilities of the underrepresented sex. Few cases have focused on "equal treatment" claims seeking substantial equality in program components of athletics. Title IX, however, not only requires schools to establish athletic programs for female athletes, but also prohibits schools from discriminating against females participating in those programs by denying equivalence in benefits, such as equipment, facilities, coaching, scheduling, and publicity. This only makes sense; if schools could meet Title IX's requirements by creating a sufficient number of female athletic programs that are substantially inferior to their male counterparts' programs, Title XI's enforcement scheme would ring hollow.

The plaintiffs here have brought an equal treatment claim for discrimination in scheduling only 53 percent of their games on primetime nights, while scheduling 95 percent of the boys' games on primetime nights. Title IX prohibits discrimination on the basis of gender by educational institutions receiving federal financial assistance. *See* 20 U.S.C. § 1681(a). Subject to exceptions not pertinent here, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id.* Congress enacted Title IX in 1972 with two principal

objectives in mind: "[T]o avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979)). The statute was modeled after Title VI, which is parallel to Title IX except it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs. *Id.* Both statutes provide the same administrative mechanism for terminating federal financial support for institutions engaged in prohibited discrimination. *See Cannon*, 441 U.S. at 696. These statutes were enacted pursuant to Congress' spending power and operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the government and the recipient of funds. *See Gebser*, 524 U.S. at 286-88.

Title IX was not specifically targeted at nor does it mention athletic programs. The issue of discrimination against women in education-based athletic programs was only discussed briefly in the congressional debates on Title IX. *See McCormick*, 370 F.3d at 286 (citing 117 Cong. Rec. 30,407 (1971) (statement of Sen. Bayh)). After the statute was passed, there were attempts to limit its effects on athletic programs, *see* 120 Cong. Rec. 15,323 (1974) (statement of Sen. Tower), but those efforts failed and Congress directed the Department of Health, Education, and Welfare (HEW) to prepare proposed regulations implementing Title IX, including in the area of

"intercollegiate athletic activities." Education Amends. of 1974, Pub. L. No. 93-380, § 844 (1974) (Javits Amendment). The HEW published regulations that specifically addressed the statute's requirements in the athletic programs of educational institutions. *See* 34 C.F.R. § 106.41. HEW followed notice and comment rulemaking procedures, and President Ford approved the final regulations, as required by Title IX, 20 U.S.C. § 1682, which went into effect in 1975. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 95-96 (4th Cir. 2011); *see also McCormick*, 370 F.3d at 287 (detailing process). The HEW was split into the Department of Health and Human Services (HHS) and the Department of Education in 1979. The HEW regulations in effect at that time were left with HHS, and the Department of Education duplicated them. *See* 45 C.F.R. pt. 86 (HHS regulations); 34 C.F.R. pt. 106 (Department of Education regulations). "All educational functions were transferred to [the Department of Education], and thus . . . [it is] the administrative agency charged with administering Title IX." *McCormick*, 379 F.3d at 287. The Department of Education's Office of Civil Rights (OCR) is responsible for enforcement of Title IX. *See* 20 U.S.C. § 3441(a)(3).

The regulations provide that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics." 34 C.F.R. § 106.41(a). They state that "[a] recipient [the school corporations here] . . . shall provide equal athletic opportunity for members of both sexes," and when

determining if equal opportunities are available the following factors, among others, should be considered: "(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes" and nine other factors that include "(3) Scheduling of games and practice time . . . ." *Id.* at 106.41(c). The first factor focuses on accommodation (known as "effective accommodation" claims—34 C.F.R. § 106.41(c)(1)) and the remaining factors focus on denial of equivalence in other athletic benefits (known as "equal treatment" claims—34 C.F.R. § 106.41(c)(2)-(10)). These are distinct claims. *See Pederson*, 213 F.3d at 865 n.4 (distinguishing between claim for lack of effective accommodation and claim for the denial of equivalence in other athletic benefits). "Effective accommodation claims . . . concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 (9th Cir. 2010).

In an effort to clarify the obligations of federal aid recipients, the HEW issued a policy interpretation in 1979. *See* 44 Fed. Reg. 71,413 (Dec. 11, 1979). Although the policy interpretation is designed specifically for intercollegiate athletics, its general principles will often apply to club, intramural, and *interscholastic* athletic programs, which are also covered by the regulations. *Id.* Both parties concede, and we do not disagree, that the policy interpretation is entitled to deference. *See Kelley v. Bd. of Tr.*, 35 F.3d 265, 268 (7th Cir. 1994) ("Since the

Policy Interpretation maps out a reasonable approach to measuring compliance with Title IX, this Court does not have the authority to condemn it."); see also *McCormick*, 370 F.3d at 290 and cases cited therein.[1]

The policy interpretation is divided into three sections: (1) compliance in financial assistance (scholarships) based on athletic ability; (2) equivalence in other athletic benefits and opportunities (equal treatment claims); and (3) effective accommodation of student interest and abilities (accommodation claims). *See* 44 Fed. Reg. 71,414. As noted, accommodation claims focus on expanding athletic programs to meet the interests of the underrepresented sex. That section provides that an institution has effectively accommodated the interests of its male and female students if it satisfies three benchmarks or "safe harbors." *See Kelley*, 35 F.3d at 271; *see also* 44 Fed. Reg. 71,418. Unfortunately, the defendants focused their defense on the "safe harbors" and facts showing that they have effectively accommodated the

---

[1] The Department published the proposed policy interpretation for public comment; it considered over 700 comments and visited eight universities before publishing the policy interpretation in its final form. *See* 44 Fed. Reg. 71413. Because the parties don't dispute that deference is afforded to the policy interpretation, and because it is both persuasive and reasonable, we need not explore whether *United States v. Mead Corp.*, 533 U.S. 218 (2001) requires *Chevron* or *Skidmore* deference. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

interests and abilities of male and female athletes. These facts are not relevant to the plaintiffs' claim that they didn't receive equal treatment in the scheduling of girls' basketball games. The defendants' only response to the disparity in scheduling is that it's not substantial enough to establish a Title IX violation.

In determining whether an institution is providing equal treatment, the policy interpretation lists as a factor the scheduling of games and practice times and particularly, the time of day competitive events are scheduled. 44 Fed. Reg. at 71,416. The policy states:

> The Department will assess compliance . . . by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the *overall effect of any differences is negligible.*

*Id.* at 71,415 (emphasis added). The policy also states: "If comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability, a finding of compliance may still be justified if the differences are the result of nondiscriminatory factors." *Id.* When there are "disparities in benefits, treatment, services, or opportunities in individual segments of the program," as in this case, the Department will base its compliance determination on whether such disparities are "substantial enough in and

of themselves to deny equality of athletic opportunity." *Id.* at 71,417. In responding to commentators who suggested measuring equality of opportunity by having a "sport specific" comparison, the Department disagreed and noted that "a sport specific comparison could actually create unequal opportunity." *Id.* at 71,422. "[T]he regulation frames the general compliance obligations of recipients in terms of program-wide benefits and opportunities"[;] "Title IX protects the individual as a student-athlete, not as a basketball player, or swimmer." *Id.*

Although Congress authorized an administrative enforcement scheme for Title IX, the Supreme Court has recognized an implied private right of action to enforce its ban on intentional discrimination via Section 1681. *Cannon*, 441 U.S. at 717. The Court subsequently established that monetary damages, in addition to injunctive relief, are available in such actions. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75-76 (1992) (holding that monetary damages are recoverable in a sexual harassment suit where intentional discrimination was alleged). The Supreme Court has further stated that claimants under Title IX need not exhaust administrative remedies before bringing suit directly in court. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 247 (2009).

After *Cannon*, the Court held in *Alexander v. Sandoval*, 532 U.S. 275, 289-90 (2001), that there was no private right of action to enforce a disparate-impact regulation promulgated under the similarly worded Title VI. The

Court noted that, similar to Title IX, private individuals may sue to enforce 42 U.S.C. § 601 and obtain both injunctive relief and damages, but only for intentional discrimination. *Id.* at 280-81. The Court stated: "We do not doubt that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section. Such regulations, if valid and reasonable, authoritatively construe the statute itself, . . . and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." *Id.* at 284. This is because if Congress "intends the statute to be enforced through a private cause of action [it] intends the authoritative interpretation of the statute to be so enforced as well." *Id.* The Court, however, held that there was no similar private right of action to enforce disparate-impact regulations because § 601 prohibits only intentional discrimination. *Id.* at 285-86, 293. The court reasoned: "It is clear . . . that the disparate-impact regulations do not simply apply § 601—since they indeed forbid conduct that § 601 permits—and therefore clear that the private right of action to enforce § 601 does not include a private right to enforce these regulations." *Id.* at 285.

But the plaintiffs did not bring a disparate impact claim, they brought a disparate treatment claim. They challenge the defendants' facially discriminatory policy of scheduling more boys' basketball games on primetime nights than girls' basketball games because of sex. *See Anderson v. Cornejo*, 355 F.3d 1021, 1024 (7th Cir. 2004) ("'[I]ntent' (and thus disparate treatment) in constitutional law means doing something because of, rather

than in spite of (or with indifference to), the prohibited characteristic."); *see also Cmtys. for Equity*, 459 F.3d at 694 (stating that when there is a facially discriminatory policy, the plaintiff needn't show that the defendant acted with discriminatory animus but only that the defendant intentionally treated one group less favorably because of their sex).[2] The plaintiffs rely on the express prohibition in § 1681(a) against intentional sex discrimination and the regulations that apply § 1681(a)'s ban on intentional discrimination; "it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." *Sandoval*, 532 U.S. at 284 ("A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well."). Thus, although *Amicus Curiae* Eagle Forum contends that under *Sandoval* this case should be dismissed because the regulations can't grant a private right of action, its focus on the regulations misses the mark. The claim here is intentional sex discrimination under § 1681(a) for which *Cannon* held there is a private cause of action; the regulations merely provide guidance in interpreting § 1681.

---

[2] *Amicus Curiae* Eagle Forum Education & Legal Defense Fund (Eagle Forum) asserts that the scheduling decisions here were not because of sex, and rather, the schools have many possible reasons for disparate schedules. This ignores the schools' implicit concession that the scheduling was because of sex; the schools have not pointed to any other reason for the disparate treatment.

Because Title IX was enacted as an exercise of Congress' powers under the Spending Clause, the implied right of action for money damages exists only where funding recipients had adequate notice that they could be liable for the conduct at issue. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 181-82 (2005); *Gebser*, 524 U.S. at 289. That is because "[w]hen Congress enacts legislation under its spending power, that legislation is 'in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Jackson,* 544 U.S. at 181-82 (citing *Pennhurst*, 451 U.S. at 17). *Pennhurst*, however, does not preclude private suits for intentional acts that violate the clear terms of the statute. *Id.* (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999)). Recipients will have sufficient notice where a statute makes clear that some conditions are placed on the receipt of federal funds, even if Congress has not specifically identified and proscribed each condition in the legislation. *Id.* (citing *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 665-66 (1985)).

"[F]unding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when [the Court] decided *Cannon*." *Jackson,* 544 U.S. at 182. The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Id.* at 183 (citing *Gebser* and *Davis*); *see also id.* at 175 ("'Discrimination' is a term that covers a wide range of intentional unequal

treatment; by using such a broad term, Congress gave the statute a broad reach."). For example, even though the statute does not mention sexual harassment, the Court has held that Title IX proscribes harassment with sufficient clarity to satisfy *Pennhurst*'s notice requirement and serve as a basis for a damages action. *See Gebser*, 524 U.S. at 290-91 (private right of action for damages under Title IX encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to teacher's sexual harassment of a student); *see also Davis*, 526 U.S. at 633 (private right of action for damages under Title IX exists for "student-on-student" harassment where funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities). This case may present an "even easier case than deliberate indifference" because the actions at issue here are "easily attributable to the funding recipient," and thus, "always—by definition—intentional." *See Jackson,* 544 U.S. at 183-84 (plain terms of Title IX prohibit retaliation based on coaches's complaints that girls' basketball team wasn't receiving equal funding and equal access to athletic equipment and facilities).

A question we raised at oral argument was whether the defendants were on notice under the plain statement doctrine as most recently articulated in *Sossamon v. Texas*, 131 S. Ct. 1651 (2011), that they were intentionally violating the clear terms of Title IX by the disparate scheduling practices even though they were otherwise providing the girls with equal athletic opportunity in the sport programs offered? We asked for supple-

mental briefing on this issue and the defendants essentially conceded that a private right of action can arise for an equal treatment type claim where the sport specific "disparity is 'substantial enough' by itself to deny girls . . . equality of athletic opportunity." (Appeal Doc. 37, p. 4) (citing *McCormick*, 370 F.3d at 295). Instead of arguing that this suit is barred by the plain statement doctrine, the defendants contend that the plaintiffs have failed to show a pervasive, substantial disparity. Thus, the defendants have waived this argument by not raising it before the district court or developing it on appeal. *See, e.g., Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs.*, 603 F.3d 365, 370 (7th Cir. 2010) (Eleventh Amendment defense is waivable) (citing *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002)). We don't disagree with the defendants that Title IX requires a systemic, substantial disparity that amounts to a denial of equal opportunity before finding a violation of the statute, *see, e.g., Davis*, 526 U.S. at 650 (deliberate indifference to sexual harassment not actionable unless harassment is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school"), so it is to that issue we now turn.

While accommodation claims are the subject of most Title IX cases, at least two circuits and a number of district courts have determined that plaintiffs made out a successful equal treatment claim. *See McCormick*, 370 F.3d at 295-96 (finding school districts' scheduling of girls' high school soccer in the spring and the boys' in the fall deprived the girls but not the boys of the oppor-

tunity to compete in the regional and state championships, in violation of Title IX); *see also Cmtys. for Equity*, 178 F. Supp. 2d at 855-57 (holding that high school athletic association violated Title IX by scheduling athletic seasons and tournaments for girls' sports during non-traditional and less advantageous times of the academic year than boys' athletic seasons and tournaments), *aff'd*, 459 F.3d at 695-96.

In analyzing the plaintiffs' claim, we must first deter-mine whether a difference in scheduling has a negative impact on one sex, and then determine whether that disparity is substantial enough to deny members equality of athletic opportunity. *See McCormick*, 370 F.3d at 293. The court should look to the overall effect of any differences on a program-wide, not sport-specific basis. *Id.* (citing 44 Fed. Reg. at 71,422). For example, disadvantaging one sex in one part of a school's athletic program can be offset by a comparable advantage to that sex in another area. *Id.* The defendants have not pointed to any areas in which female athletes receive comparably better treatment than male athletes at their schools to offset any disadvantage resulting from the defendants' basketball scheduling practices. Accordingly, we must consider whether the sport-specific disparity is sub-stantial enough to deny equal athletic opportunity, which we believe includes equivalent opportunity to compete before audiences.

Initially we note that the disparity here was systemic. The evidence shows that Franklin has maintained this scheduling disparity for several years (at least since

2007) and we presume it has been this way since the programs were initially established. Back in 1997, the OCR wrote a letter to the Indiana High School Athletic Association (IHSAA), indicating that the OCR viewed the difference in boys' and girls' basketball schedules as substantial. The OCR wrote the letter because it was concerned about the scheduling practices of high school basketball games in Indiana. The IHSAA distributed the letter to member schools, including the defendants in this action, and encouraged them to assess their programs. The letter stated that "[i]n enforcing the Title IX regulatory requirements pertaining to the scheduling of games, OCR also examines the day of the week on which competitive events are scheduled and assesses whether the scheduling of competitions by a given recipient allows athletes of both sexes an equivalent opportunity to compete before audiences." If an institution reserves primetime for boys, the OCR explained that the institution "would be expected to provide a non-discriminatory justification for the difference in treatment." An institution cannot, the OCR wrote, adhere to "tradition" or to the scheduling practices of the conference as a legitimate, non-discriminatory justification for gender-based difference in treatment.

The letter continued that the schools "could be found by OCR to be out of compliance with the scheduling of games and practice times component of the athletic provisions of Title IX if they reserve Friday nights for boys basketball games and schedule girls basketball games on other nights." The OCR concluded that it would consider "whether Friday night games offer the

best opportunity to compete before the largest possible audience, whether week night games, particularly when travel is involved, have a disproportionately negative effect on the academic studies of the members of the girls basketball team, and whether the athletics and coaches of the boys and girls basketball teams consider Friday nights to be the optimal time to compete."

The letter from the OCR was distributed to Franklin fourteen years ago; yet, the disparity in scheduling continues. Franklin notes that it is seeking to remedy the disparity on an ongoing basis and that the number of games girls played in primetime increased by ten percent in 2009-2010. But despite Franklin's efforts, a trier of fact could determine that the present disparity—girls play 53 percent of their games on primetime nights while boys play 95 percent of their games on primetime nights—is substantial enough to deny equal athletic opportunity and that Franklin hasn't gone far enough to remedy the harmful effects of this disparity. The plaintiffs presented evidence of the negative impact this disparity has on the girls— disproportionate academic burdens resulting from a larger number of weeknight games, reduced school and community support (loss of audience), and psychological harms (a feeling of inferiority). The Women's Sports Foundation and others filed an amicus brief devoted largely to demonstrating the harm suffered by girls by being relegated to non-primetime scheduling, noting similar concerns as the plaintiffs. We agree that these harms are not insignificant and may have the effect of discouraging girls from participating in sports in contravention of the purposes of Title IX.

For example, girls might be less interested in joining the basketball team because of a lack of school and community support, which results in the perception that the girls' team is inferior and less deserving than the boys'. The practice of scheduling almost twice as many boys' basketball games on primetime nights sends a message that female athletes are subordinate to their male counterparts and are "second-class." *See Cmtys. for Equity*, 178 F. Supp. 2d at 836 (describing psychological effects of disparate scheduling); *see also McCormick*, 370 F.3d at 295 ("Scheduling the girls' soccer season out of the championship game season sends a message to the girls on the teams that they are not expected to succeed and that the school does not value their athletic abilities as much as it values the abilities of the boys."). This message echos throughout the community and has stunted the development of a base of women's sport fans. *See* Note, *Cheering on Women and Girls in Sports: Using Title IX to Fight Gender Role Oppression*, 110 Harv. L. Rev. 1627, 1630 (1997) ("Women's and girls' sports are [often] marginalized by a lack of attendance and support."). "There can . . . be little doubt that this second-class treatment is at least part of the reason why women do not take up, or continue in, sport[s] at the same rate as men." See Koller, *supra* at 405-06.

Thus, this disparate scheduling creates a cyclical effect that stifles community support, prevents the development of a fan base, and discourages females from participating in a traditionally male-dominated sport. Accordingly, "[t]he different value that society may place on the competitive success of female athletes as compared

to male athletes . . . must not play a role in our assessment of the significance of the denial of opportunity to the female athletes . . . ." *McCormick*, 370 F.3d at 296. The central aspect of Title IX's purpose is to *encourage* women to participate in sports, *Neal*, 198 F.3d at 768, despite stereotyped notions of women's interests and abilities, *Cohen v. Brown Univ.*, 101 F.3d 155, 179 (1st Cir. 1996) ("Title IX was enacted in order to remedy discrimination that results from stereotyped notions of women's interests and abilities."). "Interest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience." *Id.*

Further, some girls who would like to try out for the team may be dissuaded by the number of non-primetime games that conflict with their academic studies. When the girls play weeknight games, the time they have to complete their homework and study for tests is severely restricted, placing them at an academic disadvantage. J.L.P. attested that by the time the junior varsity and varsity games end, it is close to 10:00 p.m. and she is often up until 11:30 p.m. to 12:30 a.m. finishing homework. The disparity in scheduling and resulting conflict that the girls face between basketball and academics may discourage them from participating in basketball altogether.

Based on these harms suffered by the Franklin girls' basketball team because of the obvious disparity in scheduling, we conclude that the plaintiffs have presented sufficient evidence for trial to determine whether the disparity and resulting harm in this case are substantial enough to deny equal athletic opportunity.

The defendants argue in a footnote that the non-Franklin defendants should be dismissed because neither plaintiff attended those schools and thus, they were not the direct beneficiaries of the federal funds flowing to those schools. The defendants have waived this argument by not developing it on appeal. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008) (undeveloped arguments are waived). Their argument is in a footnote, consists of four sentences, and contains no citation to authority. The defendants attempt to "incorporate . . . by reference" arguments in their brief to the district court seeking to dismiss the non-Franklin defendants on this basis, but "appellate briefs may not incorporate other documents by reference." *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 435-36 (7th Cir. 2002); *see also United States v. Foster*, 789 F.2d 457, 462 (7th Cir. 1986).

The non-Franklin defendants are necessary parties in the scheduling of games. The defendants jointly agree on the schedules and Franklin cannot unilaterally change the schedules. In fact, when Franklin's athletic director tried to increase the number of primetime girls' basketball games, the other athletic directors in the EIAC conference refused her request. The non-Franklin defendants must comply with any injunction that is issued in this case; otherwise the plaintiffs are left without an effective remedy. *See* Fed. R. Civ. P. 65(d)(2)(C) (stating that an injunction binds parties and other persons who are in active concert or participation with a party if they receive actual notice); *see also Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d

914, 919 (7th Cir. 1996) ("[P]arties otherwise without an injunction's coverage may subject themselves to its proscriptions should they aid or abet the named parties in a concerted attempt to subvert those proscriptions.").

The plaintiffs, however, cannot seek monetary damages against the non-Franklin schools because their argument focuses on the harm suffered as a result of *Franklin's* overall disparate scheduling practices. The non-Franklin schools may have contributed to the plaintiffs' harm in scheduling the one or two games those defendants played against Franklin. However, Title IX requires examination of the overall scheduling practices of a school and the resulting harm from any disparity; that examination is missing here as to the non-Franklin defendants. In fact, some of the non-Franklin schools have significantly less scheduling disparity than Franklin and others played the Franklin girls' team on a primetime night. Nevertheless, if a trier of fact finds in favor of the plaintiffs, any remedy will require the affirmative effort of all defendants, and thus, as noted above, the non-Franklin defendants are subject to any injunction that may be entered against Franklin.

## B. Equal Protection Claim

The plaintiffs have also asserted a claim under 42 U.S.C. § 1983 for violation of the equal protection clause of the Fourteenth Amendment. U.S. CONST. amend. XIV, § 1. Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing con-

stitutional rights. *See Fitzgerald*, 555 U.S. at 258. "Even where particular activities and particular defendants are subject to both Title IX and the Equal Protection Clause, the standards for establishing liability may not be wholly congruent." *Id.* at 257. Without reaching the merits of the plaintiffs' equal protection claim, the district court granted summary judgment to the defendants on the basis of state sovereign immunity under the Eleventh Amendment.[3]

---

[3] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The text of the Eleventh Amendment "does not provide for immunity when a citizen sues his resident state." *See Crosetto v. State Bar of Wis.*, 12 F.3d 1396, 1400 n.5 (7th Cir. 1993). The Court, nevertheless, has "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms . . . . That presupposition, first observed over a century ago in *Hans v. Louisiana*, 134 U.S. 1 (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent[.]'" *Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 472-73 (7th Cir. 2011) (quoting *Seminole Tribe of Florida v. Fla.*, 517 U.S. 44, 54 (1996)). "In developing the *Hans* doctrine, the Eleventh Amendment has served as a historical framework for the Supreme Court's teaching that the Constitution never granted federal

(continued...)

"A cause of action under § 1983 requires a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, by a *person* acting under color of law." *Padula v. Leimbach*, 656 F.3d 595, 600 (7th Cir. 2011) (emphasis added). We don't need to address state sovereign immunity where we can resolve the issue by examining whether the defendants are "persons" under § 1983. "It is both unnecessary and inappropriate to decide whether the Constitution would prevent litigation that Congress has not authorized in the first place." *See Holton v. Ind. Horse Racing Comm'n*, 398 F.3d 928, 929 (7th Cir. 2005) (citing *Lapides*, 535 U.S. at 617-18). On the other hand, if the defendants are "persons" within the meaning of § 1983, Congress, as part of its powers under Section 5 of the Fourteenth Amendment, has exercised its power to allow suit against them. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Mercado v. Dart*, 604 F.3d 360, 362 (7th Cir. 2010).

The Supreme Court has construed the statute to include "municipal corporations and similar governmental entities" as "persons" subject to § 1983 liability. *Howlett v. Rose*, 496 U.S. 356, 376 (1990). The Court in *Howlett* restated the proposition that "[b]y including municipalities within the class of 'persons' subject to liability for violations of the Federal Constitution and

---

[3] (...continued)

courts any judicial power over suits by a citizen against his own state." *Crosetto*, 12 F.3d at 1400.

laws, Congress—the supreme sovereign on matters of federal law—abolished whatever vestige of the State's sovereign immunity the municipality possessed." *Id.* "Federal law makes governmental defendants that are not arms of the State, such as municipalities, liable for their constitutional violations." *Id.* at 377. The Supreme Court again reiterated in *Will* that units of local government are "persons" and are therefore, subject to suit under § 1983. *See Will*, 491 U.S. at 70.

School corporations are political subdivisions with locally elected school board members and super-intendents; as such, they are local government units. *See, e.g.*, *Bd. of Trs. of Hamilton Heights Sch. Corp. v. Landry*, 638 N.E.2d 1261, 1265 (Ind. Ct. App. 1994) (reviewing Indiana statutory provisions and finding that they define a school corporation as a "political subdivision."); *see also* Ind. Code § 4-12-1-2(d) (definition of "agency of the state" excludes school districts); Ind. Code § 22-9-1-12.1 (definition of "state agency" excludes public school corporations); Ind. Code § 36-1-2-10 (definition of "munici-pal corporation" includes school corporation); Ind. Code § 5-10.1-1-7 (definition of "political subdivision" in-cludes public school corporation).

The defendants, however, argue that they are "arms of the state," not independent political subdivisions, and as such, are not "persons" for the purpose of § 1983 and not subject to suit. *See Will*, 491 U.S. at 70 (instructing lower courts to refer to the Eleventh Amendment arm-of-the-state analysis in determining whether an entity is a "person" for purposes of § 1983) (citing

*Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977));
*see, e.g., Kaimowitz v. Bd. of Trs. of the Univ. of Ill.*, 951 F.2d
765, 767 (7th Cir. 1992) ("Because this Court has deter-
mined in previous § 1983 actions that a state university
is an alter ego of the state, and, under *Will*, a 'State is
not a person' under § 1983, it follows that a state
university is not a person within the meaning of § 1983
and therefore not subject to suits brought under
§ 1983."). In addressing this issue, we look to the scope
of the Eleventh Amendment; although the scope of
the Eleventh Amendment and the scope of § 1983
are separate issues, "in deciphering congressional intent
as to the scope of § 1983, the scope of the Eleventh Amend-
ment is a consideration," and the Supreme Court
has declined to adopt a reading of § 1983 that disregards
it. *Will,* 491 U.S. at 66.

We believe that under *Will*, as local governmental
units, the school corporations are clearly "persons"
within the ambit of § 1983. *Id.* at 70. Nevertheless, for
completeness, we address the defendants' argument
that they are arms of the state under Eleventh Amend-
ment jurisprudence and thus not "persons" under § 1983.
The Supreme Court has set forth four factors as relevant
in determining whether a local school district is an arm
of the state: (1) the characterization of the district
under state law; (2) the guidance and control exercised
by the state over the local school board; (3) the degree
of state funding received by the district; and (4) the
local board's ability to issue bonds and levy taxes on
its own behalf. *See Mt. Healthy*, 429 U.S. at 280 (holding
that a local school board, as constituted by Ohio law,

is "more like a county or city than it is like an arm of the State."); *see also Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417, 420 (7th Cir. 2008) ("To determine if a particular entity is an arm of the state, courts look primarily at two factors: (1) the extent of the entity's financial autonomy from the state; and (2) the 'general legal status' of the entity[;]" the entity's financial autonomy is the most important factor.) (quotations omitted).

The Supreme Court in *Regents of the University of California v. Doe*, 519 U.S. 425, 429 (1997) explained that "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit . . . ." *Id.* (quotations omitted). When making this determination, we should inquire "into the relationship between the State and the entity in question," and examine "the nature of the entity created by state law." *Id.* "[T]he question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued." *Id.* at 430. "[I]t is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Id.* at 431; *see also id.* 428, 431 (quoting with approval dissenting judge's statement that "[t]he question is not who pays in the end; it is who is legally obligated to pay the judgment that is being sought.") (quoting *Doe*

*v. Lawrence Livermore Nat'l Lab.*, 65 F.3d 771, 777-78 (9th Cir. 1995) (Canby, J. dissenting), *rev'd*, 519 U.S. 425); *see also Duke v. Grady Mun. Schs.*, 127 F.3d 972, 981 (10th Cir. 1997) ("We interpret *Doe* to require us to focus on *legal liability* for a judgment, rather than *practical*, or indirect, impact a judgment would have on a state's treasury.") (emphasis added).

We have previously held that "[a] local school district ordinarily is not a 'State' and hence may be sued in federal court . . . ." *Gary A. v. New Trier High Sch. Dist. No. 203*, 796 F.2d 940, 945 (7th Cir. 1986). However, in 2008, the Indiana legislature passed Public Law 146-2008, House Enrolled Act 1001, § 450-529 (amending Education Title). Through this Act, the legislature made significant amendments to its complex statutory and regulatory scheme governing the financial structure of its local school corporations and the level of state control and oversight over the decisions and activities of those school corporations. Based on the changes made by PL 146, the plaintiffs urge us to take a different course from that in *Gary*.

We begin by considering the "most salient factor" in determining whether the defendants are arms of the state—who is legally obligated to pay any judgment in this case? The answer to that question is the defendants, not the State of Indiana. With the enactment of PL 146, state funding now makes up between two-thirds to three-fourths of the state budget and state sales-tax distributions have replaced local property taxes as 100 percent of the schools' general fund revenue. Never-

theless, it's irrelevant that state aid may find its way to the plaintiffs' pocket. *Gary A.*, 796 F.2d at 945. Although the state funds a significant portion of the schools' budget, school corporations still have the power to levy taxes and issue bonds under certain circumstances for non-operating funds. For example, the debt services fund may be used to pay "debt and other obligations arising out of funds borrowed to pay judgments against the school corporation." Ind. Code § 20-40-9-6(c). This can be funded through a property tax levy. Ind. Code § 20-46-7-4. The schools have the statutory option to issue bonds for paying an adverse judgment under Ind. Code § 20-48-1-1(b)(2), the payment of which may be funded out of the debt service levy. The schools can also establish a self-insurance fund for the purposes of paying judgments. *See* Ind. Code § 20-40-12-5.

In the event of a school's inability to pay its debt service obligations, "the treasurer of state, upon being notified of the failure by a claimant, shall pay the unpaid debt service obligations that are due from the funds of the state only to the extent of the amounts appropriated by the general assembly for the calendar year for distribution to the school corporation from state funds, deducting the payment from the appropriated amounts." Ind. Code § 20-48-1-11(c); *see also* Ind. Code § 6-1.1-20.6-10(c). "This section shall be interpreted liberally so that the state shall to the extent legally valid ensure that the debt service obligations of each school corporation are paid. However, this section does not create a debt of the state." Ind. Code § 20-48-1-11(d); *see also* Ind. Code § 6-1.1-20.6-10(d). The state guarantees unpaid debt

service obligations *only* to the extent of the amounts appropriated for the school. The statute doesn't require the state to pay out additional funding to the schools for judgments. And despite this "guarantee," judgments remain the schools' legal obligation. *See, e.g., Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 233-34 (3d Cir. 2006) (school board was not arm of the state even though it received most of its funding from the state where state did not have legal obligation to provide funds in response to adverse judgment against board); *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1182 (9th Cir. 2003) (school district was not state agency even though state funds provided 98 percent of district's budget in part because state was not legally required to satisfy any monetary judgment entered against the district); *Duke*, 127 F.3d at 980-81 (concluding that even though the state provided 98 percent of the school board's budget, "the factor relating to the liability of the state treasury points away from Eleventh Amendment immunity, for the simple reason that the state of New Mexico is not *legally* liable for a judgment against a school district").

Further, as noted above, nothing in PL 146 altered the general legal status of school corporations as political subdivisions with locally elected school board members and superintendents (not gubernatorial appointments) who serve local communities (not the State of Indiana as a whole). "Indiana chose to organize public education through local school districts instead of establishing a single state agency to control all public education." *See Landry*, 638 N.E.2d at 1265 (quotations omitted). School

corporations are independent corporate bodies that can sue and be sued and enter into contracts. *See id.; see also Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 223-24 (4th Cir. 2001) (factors weighing against finding that school board was arm of state). Thus, although the state now provides a significant portion of the schools' funding through revenues raised by state sales taxes and with that has exerted significantly more guidance and control over the local school corporations, the schools are nonetheless still local units with political independence and a certain amount of operational independence. As explained, they also have the ability to raise their own funds for purposes of paying judgments and are legally obligated to pay those judgments from their budget. As such, we conclude that the defendants are "persons" within § 1983 and subject to suit.

Because the district court determined that the defendants were entitled to sovereign immunity, it never addressed whether any genuine issues of material fact exist as to plaintiffs' equal protection claims. We therefore remand for the district court to consider this issue in the first instance. *See, e.g., Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 664 (7th Cir. 2011) (declining to address issue raised on summary judgment that the district court hadn't first considered).

### III. Conclusion

For the reasons discussed above, we vacate the district court's entry of summary judgment in favor of the defen-

dants on the plaintiffs' Title IX and equal protection claims and remand for further proceedings consistent with this opinion.