# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3379ND

_____

| | | |
|---|---|---|
| Eric Chalenor; Brady Flatten; | * | |
| Chad Lorenson; and Mike Schuster, | * | |
| | * | |
| Appellants, | * | On Appeal from the United |
| | * | States District Court |
| v. | * | for the District of |
| | * | North Dakota. |
| | * | |
| University of North Dakota, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 14, 2002

Filed: May 30, 2002 (Corrected 6/11/02)

_____

Before BOWMAN, RICHARD S. ARNOLD, and HANSEN,[1] Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


In this case we consider whether Title IX of the Education Amendments of 1972, 86 Stat. 373-375, as amended, 20 U.S.C. §§ 1681-1688, prohibits a public university from eliminating a men's athletic team for the purpose of reducing the inequality of athletic participation between its male and female students. In 1998, the

_____

[1]The Hon. David R. Hansen became Chief Judge of the United States Court of Appeals for the Eighth Circuit on February 1, 2002.

University of North Dakota, citing gender-equity and budgetary issues, canceled its men's wrestling program. Only men's programs were considered for cuts. Plaintiffs, participants in the wrestling program or recruits to the program, brought suit against the University in the District Court for the District of North Dakota, alleging that the elimination of the program violated their rights under Title IX. The University moved for summary judgment, and the District Court[2] granted the motion.

In this appeal, plaintiffs argue that the elimination of the men's wrestling program was a clear example of sex discrimination, which Title IX explicitly forbids. The University, by contrast, contends that it faced a budget contraction and that, because a greater percentage of men than women at the University participate in intercollegiate athletics, and men receive a disproportionately large share of the athletic budget, continuing to fund the team would have discriminated against women. Plaintiffs counter that budgetary considerations were not a factor in the University's decision because a private donor had offered to fund the wrestling program, so the team would not have used resources that otherwise would have been available to female athletes.

The absence of budgetary issues, plaintiffs argue, distinguishes this case from decisions in other circuits upholding the elimination of various men's sports and leaves the University's desire to equalize rates of participation and resource allocation in sports by sex as the sole basis for the decision. The plaintiffs argue that allowing the University's decision to stand would be analogous to implementing a quota system by sex and would be contrary to the purpose of Title IX, which is designed to encourage, not reduce, athletic opportunities. Moreover, the University's goal of gender balance is illegitimate, they argue, because it improperly assumes that men

---

[2]The Hon. Rodney S. Webb, Chief Judge, United States District Court for the District of North Dakota.

and women have an equal interest in participating in University sports, an assumption which they contend is not borne out by the evidence.

After considering these arguments, discussed in detail below, we affirm the decision of the District Court.

## I.

On April 10, 1995, the University issued its Final Gender Equity in Athletics Report. Appellee's Appendix (App.) 10-15. To increase the rate of participation of women in athletics and to reduce the disparity between male and female participation rates, the report recommended the addition of three women's sports: golf in 1995, tennis in 1997, and soccer in 1999. App. 12. The report recommended leaving men's sports unchanged but reexamining men's sports programs during 1997-98. App. 13. The following table compares, for a four-year period following issuance of the report, the percentage of the student body that was male with the percentage of athletes that was male and the resources made available to male athletes.

Table. Participation rates and resources allocated to male athletes
(*per centum of total*)

| Academic year | Male under-graduates | Male athletes | Operating expenses for men's teams | Recruiting expenditures for men's teams | Athletically related financial aid to male athletes |
|---|---|---|---|---|---|
| 1996-97 | 52 | 73 | 74 | 86 | 75 |
| 1997-98 | 52 | 71 | 70 | 81 | 70 |
| 1998-99 | 51 | 65 | 69 | 79 | 68 |
| 1999-2000 | 51 | 64 | | 77 | 63 |

App. 16, 17, 19, 20, 32-35, 53, 69, 75, 78-80.

On May 7, 1998, the University's Intercollegiate Athletic Committee reported that $95,000 needed to be cut from the athletic budget. App. 82. The University implemented the budgetary contraction to address a $3 million shortfall in revenue from tuition and to comply with Governor Edward Schafer's request for a five per centum overall budget reduction. App. 87, 90. On May 7, and again on May 22, the committee discussed the possibility of discontinuing one men's sport. App. 82, 84. On May 29, the committee voted to eliminate the wrestling team, App. 85, thereby saving $49,000.[3] App. 82. On June 12, University President Kendall Baker approved the committee's recommendation to eliminate the wrestling program, effective June 30, 1998. App. 86. On December 3, 1999, plaintiffs filed suit. Summary judgment was granted in favor of the University on August 22, 2000.

## II.

We review a district court's grant of summary judgment de novo. Anderson v. Franklin County, 192 F.3d 1125, 1131 (8th Cir. 1999). Summary judgment is proper only when there is no genuine issue of material fact and, viewing the evidence in the light most favorable to the nonmoving party, Bailey v. United States Postal Service, 208 F.3d 652, 654 (8th Cir. 2000), the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### 1. Statutory and Regulatory Background of Title IX

Title IX prohibits educational institutions that receive federal financial support from engaging in sex-based discrimination. It states, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program

---

[3]The record does not show how the rest of the $95,000 reduction was made.

or activity receiving Federal financial assistance . . .." 20 U.S.C. § 1681(a). Pursuant to the statute, the former Department of Health, Education, and Welfare (HEW) and its successor departments, the Department of Health and Human Services (HHS) and the Department of Education, promulgated regulations implementing the statute. See Cohen v. Brown Univ., 991 F.2d 888, 894-95 (1st Cir. 1993) (explaining transformation of agency and resulting duplicative regulatory oversight). The regulations provide, in part, as follows:

> (a)    *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
>
> . . .
>
> (c)    *Equal opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide *equal athletic opportunity* for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
>
> (1)    Whether the selection of sports and levels of competition *effectively accommodate* the interests and abilities of members of both sexes . . ..

34 C.F.R. § 106.41 (2000) (Department of Education regulations) (emphasis added); see also 45 C.F.R. § 86.41 (2000) (identical HHS regulations).

To provide a clearer interpretation of what it meant by effective accommodation, HEW promulgated a policy interpretation "to provide a framework

within which the complaints can be resolved, and to provide institutions of higher education with guidance on the requirements for compliance with Title IX in intercollegiate athletic programs." 44 Fed. Reg. 71413 (1979). This interpretation requires an athletic program to meet one of three standards to accommodate effectively the interests and abilities of members of both sexes so as to comply with Title IX:

> (1)     Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

> (2)     Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

> (3)     Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71418 (1979).

On January 16, 1996, the Department of Education issued a clarification memorandum to provide further guidance regarding its policy interpretation. It stated:

[T]he three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. If an institution has met any part of the three-part test, [the Department's Office for Civil Rights] will determine that the institution is meeting this requirement.

Department of Education, Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996).

The Department's letter transmitting the memorandum further explained that "an institution can choose which part of the test it plans to meet." Letter from Norma V. Cantú, Assistant Secretary for Civil Rights, Department of Education (Jan. 16, 1996). Compliance with the first prong of the test "affords an institution a 'safe harbor' for establishing that it provides nondiscriminatory participation opportunities." Id. The letter goes on to state that limiting men's teams in pursuit of equalizing athletic opportunities between the sexes is consistent with Title IX. "An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test." Id.

2. Deference Owed to the Department of Education's Policy Interpretation

The University's Final Gender Equity in Athletics Report reveals, and plaintiffs do not dispute, that the University was attempting to comply with the first part of the test. App. 11. Thus, the University relies on the policy interpretation, the clarification memorandum, and the transmittal letter to argue that its decision to cut men's wrestling was not a violation of Title IX, but rather an action taken to comply with Title IX. It argues that the policy interpretation on which it relies for its defense—the agency's interpretation of its own regulations—is entitled to substantial

deference. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations.").

In response, plaintiffs contend, citing Christensen v. Harris County, 529 U.S. 576 (2000), that substantial deference is not due to any of these documents, so the University's reliance on them is misplaced. Id. at 587 ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference."). Assuming Chevron deference is not due, it is still true that "interpretations contained in formats such as opinion letters are 'entitled to respect' . . . to the extent that these interpretations have the 'power to persuade.' " Christensen, 529 U.S. at 587 (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); cf. Christensen, 529 U.S. at 590-91 (Scalia, J., concurring) (listing cases in which Court accorded deference to agency interpretations issued in formats other than formal regulations and adjudications).

As the Christensen Court recognized, Auer v. Robbins, 519 U.S. 452 (1997), requires that we give deference to an agency's interpretation of its own regulations, if the regulations are ambiguous. Christensen, 529 U.S. at 588 (citing Auer, 519 U.S. at 461). If the regulation is ambiguous, then we defer to any reasonable construction by the Department of Education, even though its interpretation might "not be the best or most natural one by grammatical or other standards." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991). Here, the regulatory language that the policy interpretation construes describes how an institution can provide "equal athletic opportunity for members of both sexes" and "effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c) (2000). As the high number of suits that arose immediately after promulgation of the regulation attests, this language is written at a high level of abstraction and, as a result, is ambiguous. See Cohen, 991 F.2d at 896 (noting that in three years following promulgation of regulations but prior to issuance of policy interpretation, HEW received over one

hundred discrimination complaints involving more than fifty schools). We conclude, as did the <u>Cohen</u> court, that the policy interpretation constitutes a reasonable and "considered interpretation of the regulation." <u>Id.</u> Therefore, controlling deference is due it. See <u>Glover v. Standard Fed. Bank</u>, 283 F.3d 953, 962 (8th Cir. 2002) (discussing Supreme Court cases and finding agency's policy interpretations of its own regulations to be "controlling authority").

Finally, although plaintiffs argue that the "flawed" policy interpretation should not receive substantial deference, nowhere in their briefs or, crucially, before the District Court, do they argue that the policy interpretation is not valid. The validity of the interpretation was not put in question before the District Court, so the Court relied, as it was supposed to, on that interpretation. As we are not presented with that issue here, consideration of it will have to await another day.[4]

The plaintiffs next argue that even if the policy interpretation is entitled to deference, the University has not established that it was required to engage in gender balancing. They argue that the University could have chosen to pursue one of the other two alternatives under the interpretation and that it has failed to show that it has not actually met either of those alternatives.

Although plaintiffs make this argument, they also recognize that the University does not contend that gender proportionality is required, only that it is permissible. The University's position is correct. Title IX states:

> Nothing contained in subsection (a) of this section shall be interpreted *to require* any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which

---

[4]It is worth noting that the interpretation has guided the Office for Civil Rights' enforcement of nondiscrimination in athletics for over two decades, without change from Congress. No court has ever held it to be invalid.

may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area . . ..

20 U.S.C. § 1681(b) (emphasis added).  Thus, although Title IX does not require proportionality, the statute does not forbid it either.  And the gender make-up of athletic participation is certainly relevant to a determination of whether a school is in compliance with Title IX.  As the statute goes on to say: "[T]his subsection shall not be construed to prevent the consideration . . . of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex."  Id.

### 3.  The Availability of Private Outside Funding

In the complaint, plaintiffs alleged that the University eliminated the men's wrestling program to attain proportionality between the gender composition of athletic teams and the gender composition of the student body.  App. 6.  And on summary judgment, the University stipulated that it had eliminated the program for purposes of gender balancing.  Contrary to the plaintiffs' apparent belief, however, this stipulation is not inconsistent with the fact—which plaintiffs do not dispute—that the athletic department's budget had to be reduced in the face of a tuition shortfall and the Governor's proposed University-wide funding cut.[5]  Thus, it is undisputed

---

[5]In their opening brief, plaintiffs state that "in the spring of 1998, Governor [Schafer] rescinded his tentative 5% cut stating that it was only a practice." Appellant's Brief 2.  We do not know what this sentence means.  In any event, plaintiffs furnish no citation to the record, and nothing in the record appears to support this point.  Regardless of the outcome of the Governor's proposal, the University did implement funding cuts.

that the University eliminated the wrestling team to improve gender balance in the context of a budgetary contraction.

The plaintiffs attempt to circumvent the issue of the budget reduction by alleging that a private donor was available to fund the wrestling program and, therefore, that the University could have eliminated its funding without canceling the entire program. As a result, they argue, budgetary issues raised by the University are a red herring designed to disguise the University's true discriminatory motive.

There are several problems with the plaintiffs' argument. First, the person who offered to fund the program, Dan Sampson, did not say how much he would provide (indeed, he stated only that he would cover "shortfalls in allocation to the program by UND," not that he would fund the entire program) or how long his funding would continue. App. 105 (Affidavit of Dan Sampson).

More importantly, however, a public university cannot avoid its legal obligations by substituting funds from private sources for funds from tax revenues. Once a university receives a monetary donation, the funds become public money, subject to Title IX's legal obligations in their disbursement. As the District Court properly explained, outside funding is not a defense for "a university which provides more than substantially proportionate athletic opportunity to one gender in violation of Title IX." Chalenor v. Univ. of N.D., No. 2-99cv-170, slip op. at 7 (Aug. 22, 2000) (reproduced at App. 113). Thus, the District Court correctly concluded: "A school may not skirt the requirement of providing both sexes equal opportunity in athletic programs by providing one sex more than substantially proportionate opportunity through the guise of 'outside funding.' " Chalenor, No. 2-99cv-170, slip op. at 8. The University had no obligation to accept the donation, and, even if it had, disbursement of the funds still would have been subject to the strictures of Title IX.

Nevertheless, plaintiffs use their argument that the University faced no budget constraint to attempt to distinguish this case from relevant case law from other circuits holding that a university can comply with Title IX by limiting athletic opportunities for men only. Plaintiffs' argument is without merit. This case, like the cases from other circuits and all cases involving distribution of university funds, involves budget constraints. And, as the Ninth Circuit noted in Neal v. Bd. of Trs. of Cal. State Univs., 198 F.3d 763 (9th Cir. 1999), "[e]very court, in construing the Policy Interpretation and the text of Title IX, has held that a university may bring itself into Title IX compliance by increasing athletic opportunities for the underrepresented gender (women in this case) *or* by decreasing athletic opportunities for the overrepresented gender (men in this case)." Id. at 769-70.

The cases from other circuits include: Neal, 198 F.3d at 771 (allowing university to make gender-conscious decisions and noting that "the plain meaning of the nondiscrimination principle set forth in 20 U.S.C. § 1681(a) does not bar remedial actions designed to achieve substantial proportionality between athletic rosters and student bodies"); Boulahanis v. Bd. of Regents, 198 F.3d 633, 638 (7th Cir. 1999) (holding that university's elimination of men's soccer and men's wrestling teams "is not a violation of Title IX as long as men's participation in athletics continues to be 'substantially proportionate' to their enrollment") (citation omitted), cert. denied, 530 U.S. 1284 (2000); Horner v. Ky. High Sch. Athletic Ass'n, 43 F.3d 265, 275 (6th Cir. 1994) (noting that "[a]n institution need not pour ever-increasing sums into its athletic programs in order to bring itself into compliance, but has the option of reducing opportunities for the overrepresented gender while keeping opportunities for the underrepresented gender stable") (citation omitted); Kelley v. Bd. of Trs., 35 F.3d 265, 270 (7th Cir. 1994) (allowing university to eliminate men's swimming team while retaining women's swimming team because male athletes on the whole "would continue to be more than substantially proportionate to their presence in the University's student body"), cert. denied, 513 U.S. 1128 (1995); Roberts v. Colo. State Bd. of Agric., 998 F.2d 824, 830 (10th Cir.) ("Financially strapped institutions

-12-

may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population."), cert. denied, 510 U.S. 1004 (1993); Cohen, 991 F.2d at 898 n.15 (noting that university can "bring itself into compliance" with Title IX "by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent)").

Although these cases do not bind our Court, we find their reasoning sound, and we are, in any event, reluctant to create a conflict within the circuits on the issue. Aldens, Inc. v. Miller, 610 F.2d 538, 541 (8th Cir. 1979) ("Although we are not bound by another circuit's decision, we adhere to the policy that a sister circuit's reasoned decision deserves great weight and precedential value. As an appellate court, we strive to maintain uniformity in the law among the circuits, wherever reasoned analysis will allow, thus avoiding unnecessary burdens on the Supreme Court docket."), cert. denied, 446 U.S. 919 (1980).

Finally, plaintiffs contend not only that Title IX prohibits gender balancing, but, in a footnote in their brief, that the Fourteenth Amendment forbids it as well. Plaintiffs' Reply Brief 8 n.2. However, plaintiffs admit that they "did not assert a constitutional violation" in the District Court, ibid., so we need not decide the constitutional issue.

4. Request for Disqualification of the District Judge

Finally, plaintiffs contend that because Chief Judge Webb was graduated from and is a contributor to the University of North Dakota, "there seems to be a major conflict of interest" affecting their right to a fair and impartial hearing. Appellants' Brief 7. This argument is wholly without merit. We reject it emphatically. Both the fact that Judge Webb is an alumnus of the University and the fact that he has

contributed financially to the University are immaterial, unless the facts indicated a specific and particular interest in the wrestling program or some other particularly relevant problem. Here, there are no facts indicating how much was given or for what specific purpose, if any. See Lunde v. Helms, 29 F.3d 367, 370-71 (8th Cir. 1994) ("We do not think that the district judge's having graduated from the university law school, even though the university is a party defendant, without more, is a reasonable basis for questioning the judge's impartiality. . . . We do not think that making alumni contributions or participating in university educational programs, without more, is a reasonable basis for questioning the judge's impartiality.") (citations omitted), cert. denied, 513 U.S. 1155 (1995).

## III.  Conclusion

For the foregoing reasons, we affirm the District Court's grant of summary judgment in favor of the University.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.