# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2517

_____

Breanna Berndsen; Kristen Elizabeth Joyce Campbell; Charly Dahlquist; Taylor Flaherty; Ryleigh Houston; Anna Kilponen; Rebekah Kolstad; Sarah LeCavalier; Alyssa MacMillan; Annelise Rice; Abigail Stanley

*Plaintiffs - Appellants*

v.

North Dakota University System

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of North Dakota - Fargo

_____

Submitted: October 20, 2020
Filed: August 10, 2021

_____

Before COLLOTON, GRASZ, and STRAS, Circuit Judges.

_____

GRASZ, Circuit Judge.

After the University of North Dakota cut its women's ice hockey team—but not its men's ice hockey team—the former players sued the university system for violating Title IX, the ban on sex discrimination at federally-funded institutions. *See* Title IX of the Education Amendments of 1972, as amended, 20 U.S.C.

§§ 1681–1688.  The district court granted the University's motion to dismiss for failure to state a claim.  We reverse.

## I.  Background

In their putative class action on behalf of current, prospective, and future female athletes, the athletes alleged that statewide, North Dakotans favor ice hockey over all other sports.[1]  High school and club teams across the state and region reflect that popularity as young women play ice hockey and want to keep playing in college.

Seventy-three years after the University started the men's team, it started the women's team.  For women, ice hockey was the "most prominent and most popular" sport on campus, with eight Olympians on its roster at one point.  The team played against seven other teams in "the strongest and most competitive women's ice hockey league" in the country.  It did so at the "most competitive" collegiate level (National Collegiate Athletic Association Division I), alongside thirty-four other teams.  And at its end, the team ranked sixth, nationally.

When the University cut their program, the athletes relied on an implementing regulation and an agency interpretation of that regulation to allege a Title IX claim.  The athletes' legal theory, however, clashed with the district court's understanding of how a Title IX claim should be pled, and the district court dismissed the complaint.  After reviewing the regulatory materials' text and structure, we conclude that the district court's reasoning was flawed.[2]

---

[1]We accept these allegations as true.  *See BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545, 546 (8th Cir. 2018).

[2]Given our holding, we do not reach the denial of the athletes' request for leave to amend.

## II. Analysis

### A. Title IX's Regulatory Text and Structure

Since 1972, under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Because that thirty-seven word statute does "not specifically address its application to athletics," *Equity in Athletics, Inc. v. Department of Education*, 639 F.3d 91, 95 (4th Cir. 2011), Congress directed an agency head to "prepare and publish . . . proposed regulations . . . which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Education Amendments of 1974, Pub. L. No. 93–380, § 844 (1974).

Under the implementing regulation, effective since 1975, "[n]o person shall, on the basis of sex, be excluded from *participation* in . . . any . . . athletics offered by a recipient, *and* no recipient shall *provide* any athletics separately[.]" 34 C.F.R. § 106.41(a) (emphasis added).[3] But that general ban includes an exception for some single-sex teams:

> Notwithstanding the requirements of paragraph (a) . . . , a recipient may operate . . . separate teams . . . where selection for such teams is based

---

[3]Under our precedent, the implementing regulation receives "controlling weight" because Congress expressly directed the agency to promulgate it. *Glover v. Standard Fed. Bank*, 283 F.3d 953, 961 (8th Cir. 2002) ("Agency regulations promulgated under express congressional authority are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."). The agency interpretation of that regulation receives "controlling deference." *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1047 (8th Cir. 2002).

upon competitive skill or the activity involved is a *contact sport*. However, where a recipient operates . . . a team . . . for members of one sex but operates . . . no such team for . . . the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered *unless* the sport involved is a *contact sport*.

*Id.* § 106.41(b) ("Separate Teams Provision") (emphasis added). Subsection 106.41(b) also expressly categorizes ice hockey as a contact sport. Under the next subsection, "[a] recipient which operates . . . intercollegiate . . . athletics shall provide equal athletic opportunity for members of both sexes." *Id.* § 106.41(c). The regulation sets out a nonexclusive list of factors for the agency to use in determining if "equal opportunities are available[.]" *Id.* One factor asks if "the selection of sports *and* levels of competition effectively accommodate the interests and abilities of members of both sexes[.]" *Id.* § 106.41(c)(1) (emphasis added).

Nearly four-and-a-half years after publishing the regulation, the agency issued a policy interpretation of that regulation. Title IX of the Education Amendments of 1972: A Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979) ("1979 Interpretation").[4] In doing so, the agency sought to: (1) "clarif[y] the meaning of 'equal opportunity'"; (2) "explain[] the *factors* and *standards* set out in the law and regulation which the [agency] will consider in determining . . . compli[ance]"; and (3) "provide[] guidance" to identify if any existing disparities "are justifiable and nondiscriminatory." *Id.* at 71,414 (emphasis added).

Section VII of the 1979 Interpretation delineates three overarching compliance subsections. *Id.* For this case, we only examine the third, Section VII.C: "Effective

---

[4]Neither Title IX nor the regulation expressly includes a private right of action. However, in 1979—four months before the agency published the 1979 Interpretation—the Supreme Court recognized that right. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979).

Accommodation of Student Interests and Abilities." *Id.* at 71,417–18.  Section VII.C's six distinct provisions address § 106.41(c)(1)'s mandate "to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports *and* levels of competition available to members of both sexes." *Id.* at 71,417 (emphasis added).

In Section VII.C.2, the agency explains that it "will assess compliance with the interests and abilities section of the regulation" by examining three separate issues: (a) "determination of athletic interests and abilities of students"; (b) "selection of sports offered"; and (c) "levels of competition available including the opportunity for team competition." *Id.*  Then, to correspond to those three issues, the agency sets forth three separate "Application of the Policy" provisions: (1) Section VII.C.3 ("Determination of Athletic Interests and Abilities" provision); (2) Section VII.C.4 ("Selection of Sports" provision); and (3) Section VII.C.5 ("Levels of Competition" provision).  Each of those separate provisions addresses *different* ways the agency will assess compliance.

Here, the athletes alleged that the University violated a specific provision under the Selection of Sports provision (VII.C.4.a).[5]  The Selection of Sports provision states:

> In the selection of sports, the regulation does not require institutions to integrate their teams nor to provide the same choice of sports to men and women.  However, where an institution sponsors a team in a particular sport for members of one sex, it may be required either to permit the excluded sex to try out for the team or to sponsor a separate team for the previously excluded sex.

---

[5]On appeal, the athletes limit their challenge to the Selection of Sports provision, although their complaint also included other allegations.

-5-

44 Fed. Reg. 71,417–18.

Still within the Selection of Sports provision, the agency gives two explanations for what "[e]ffective accommodation means," with one for "Contact Sports" (VII.C.4.a), and another for "Non-Contact Sports" (VII.C.4.b). *Id.* at 71,418. Under the former—which sits at the center of this appeal—the agency explains as follows:

> Effective accommodation means that if an institution sponsors a team for members of one sex in a contact sport, it *must* do so for members of the other sex under the following circumstances:
>
> (1) The opportunities for members of the excluded sex have historically been limited; and
>
> (2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team.

*Id.* ("Contact Sports Clause") (emphasis added).

The University moved to dismiss the athletes' complaint, relying on one of two compliance tests from a different provision—the Levels of Competition provision (VII.C.5). That provision addresses two issues: "the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules, which equally reflect their abilities." *Id.* Each issue then receives its own compliance provision. Section VII.C.5.a—which the University invoked and the district court relied on—gives three ways to assess participation-opportunity compliance through what is known as the "three-part test." *Id.* Section VII.C.5.b sets out two ways to assess competitive-schedule compliance. *Id.*

-6-

The 1979 Interpretation includes yet another compliance provision—one that encompasses all three of Section VII.C's "Application of the Policy" provisions. Under the "Overall Determination of Compliance" provision in Section VII.C.6, the agency "will base its compliance determination under [§ 106.41(c)] of the regulation upon a determination" of whether: (1) the "policies . . . are discriminatory in language or effect"; (2) "disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole"; or (3) "disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity." *Id.*

In 1996, the agency issued a transmittal letter and a memorandum clarifying the 1979 Interpretation's three-part test. U.S. Dep't of Educ., Off. for C.R., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996) ("1996 Clarification"). The 1996 Clarification is the agency's clarification of its own policy interpretation of its own regulation. Like other agency documents, we assume that it receives "respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), "but only to the extent that" it has "the power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140).

The 1996 Clarification says nothing about "selection of sports" or "contact sports." It explains that the three-part test gives an institution "three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to *participate* in intercollegiate athletics." 1996 Clarification (emphasis added).

Later agency clarifications have consistently reaffirmed the three-part test's use for assessing participation opportunities. And unsurprisingly, these clarifications have not mentioned "selection of sports" or "contact sports." *See* U.S. Dep't of Educ., Off. for C.R., Further Clarification of Intercollegiate Athletics Policy

Guidance Regarding Title IX Compliance (July 11, 2003) ("[T]he test offers three separate ways of assessing whether schools are providing equal opportunities . . . to *participate* in athletics." (emphasis added)); Dep't of Educ., Off. for C.R., Additional Clarification of Intercollegiate Athletics Policy: Three-Part Test—Part Three (Mar. 17, 2005), *withdrawn by* Letter from Russlynn Ali, Assistant Sec'y for C.R., U.S. Dep't of Educ. (Apr. 20, 2010) (reaffirming that the agency "uses the three-part test to determine whether an institution is providing nondiscriminatory athletic *participation* opportunities in compliance with the Title IX regulation" (emphasis added)).

## B. Title IX Analysis

Given this regulatory structure and its textual content, we disagree with the district court's reasons for dismissing the complaint. When applying the 1979 Interpretation, the district court improperly relied on a compliance test from the Levels of Competition provision (VII.C.5) as the only way to analyze a claim under the separate, unrelated Selection of Sports provision (VII.C.4).

At the outset, the 1979 Interpretation's plain text and structure show that the agency expressly gives institutions *different* ways to comply with the *different* obligations which the agency has decided Title IX imposes. Our precedent directs us to give controlling deference to the entire 1979 Interpretation, not just the three-part test in Section VII.C.5.a.

Whenever the agency has clarified the 1979 Interpretation, it has limited those clarifications to explaining participation-opportunity compliance via the often-litigated three-part test. None of those clarifications has addressed any other part of the 1979 Interpretation, including the Selection of Sports provision. The agency's decisions to repeatedly clarify the 133 words in the three-part test does not mean it

-8-

has decided to abandon the 1979 Interpretation's other 5,300-plus words. The 1996 Clarification's text and structure illustrate this point.

Far from transforming the three-part test into a cure-all for every Title IX ailment, the 1996 Clarification expressly limits its scope to determining if "students of both sexes are provided nondiscriminatory opportunities to *participate* in athletics." 1996 Clarification (emphasis added). "The Clarification confirms that institutions need to comply only with any one part of the three-part test in order to provide nondiscriminatory *participation opportunities*[.]" *Id.* (emphasis added).

The 1996 Clarification opens by generally describing the regulation (§ 106.41):

> The Title IX regulation provides that if an institution sponsors an athletic program it must provide equal athletic opportunities for members of both sexes. Among other factors, the regulation requires that an institution must effectively accommodate the athletic interests and abilities of students of both sexes to the extent necessary to provide equal athletic opportunity.

That description tracks § 106.41(c)(1) and how the 1979 Interpretation interprets the regulation (44 Fed. Reg. 74,417).

The 1996 Clarification then states that the 1979 Interpretation "provides that *as part* of this determination [the agency] will apply the . . . three-part test to assess whether an institution is providing nondiscriminatory *participation* opportunities for individuals of both sexes[.]" 1996 Clarification (emphasis added). After reciting the three-part test, the 1996 Clarification states, "the three-part test furnishes an institution with three individual avenues to choose from when determining how it will provide . . . nondiscriminatory opportunities to *participate* . . . . If an institution has met any part of the three-part test, [the agency] will determine that the institution is meeting *this requirement*." *Id.* (emphasis added). The 1996 Clarification even

appends that statement with this caveat: "It is important to note that under the [1979 Interpretation] the requirement to provide nondiscriminatory *participation* opportunities *is only one of many factors that [the agency] examines to determine if an institution is in compliance with the athletics provision* of Title IX." *Id.* (emphasis added). Thus, the 1996 Clarification limits its own application to the 1979 Interpretation's "participation opportunities" requirement in the Levels of Competition provision in Section VII.C.5.

And rather than advertising the three-part test as an omnipotent antidote to *all* athletics-based Title IX violations, the 1996 Clarification emphasizes that along with its other compliance determinations, the agency makes a separate "overall determination of compliance" in the 1979 Interpretation's Section VII.C.6. *Id.* After noting the Overall Determination of Compliance provision, the 1996 Clarification then states, "Thus [the agency] considers the effective accommodation of interests and abilities in conjunction with equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes to determine whether an institution provides equal athletic opportunity as required by Title IX." *Id.*

The 1996 Clarification's express, self-imposed limits, which address only "participation opportunities," align with the 1979 Interpretation's structure and text. By its own terms, the 1996 Clarification's text does not support treating the three-part test as a safe harbor for anything other than noncompliance with the "participation opportunities" in Section VII.C.5 of the 1979 Interpretation. This appeal asks about compliance for single-sex contact sports, which only Section VII.C.4—and not Section VII.C.5—covers.

Additionally, we disagree with the district court's conclusion that the Contact Sports Clause (VII.C.4.a) is "inconsistent" with the regulation's Separate Teams Provision (§ 106.41(b)). *See Mercer v. Duke Univ.*, 190 F.3d 643, 646–47 (4th Cir.

-10-

1999). We do not treat regulatory provisions as meaningless surplusage. *See Northshore Mining Co. v. Sec'y of Lab.*, 709 F.3d 706, 710 (8th Cir. 2013) (interpreting regulatory provisions with statutory interpretation rules); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) ("[W]e have cautioned against reading a text in a way that makes part of it redundant."). And in analyzing whether the Contact Sports Clause and the Separate Teams Provision are "inconsistent," we examine whether the former is logically consistent with the latter. *See Northshore Mining*, 709 F.3d at 709 ("When reviewing a challenged interpretation of regulatory language, the [agency's] interpretation of its own regulation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997))); *see also HealthEast Bethesda Lutheran Hosp. & Rehab Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir. 1998).

The Fourth Circuit's *Mercer* analysis is instructive here. *Mercer* analyzed how two of the regulation's provisions—§ 106.41(a) and § 106.41(b)—fit together. 190 F.3d at 646–48. The Fourth Circuit characterized the latter as "on its face . . . incomplete" because the Separate Teams Provision mandates "that members of the excluded sex must be allowed to try out for single-sex teams where no team is provided for their sex except in the case of contact sports" and "is silent regarding what requirements, if any, apply to single-sex teams in contact sports." *Id.* at 647. *Mercer* read the Separate Teams Provision to mean "members of the excluded sex must be allowed to try out for the team offered unless the sport involved is a contact sport, *in which case members of the excluded sex need not be allowed to try out*." *Id.* (emphasis in original). It reached that conclusion because the second sentence in § 106.41(b) "does not purport in any way to state an exemption, whether for contact sports or for any other subcategory, from the general anti-discrimination rule stated in [§ 106.41(a)]." *Id.*

We agree with *Mercer* that the plain text of the regulation—which we must give controlling weight—requires institutions to operate single-sex *contact sports* equally. *See id.* Because the regulation does not explain what operating equally means, we look to the 1979 Interpretation—which we also must give controlling deference—to fill any gaps.

Within the 1979 Interpretation, the Contact Sports Clause squarely answers the question of how separate contact sports teams effectively accommodate students. 44 Fed. Reg. 71,417–18. That clause's use of the mandatory term "must" unambiguously requires an institution sponsoring a single-sex contact sports team (e.g., men's ice hockey) to sponsor a team for the other sex (e.g., women's ice hockey) if: (1) "opportunities for members of the excluded sex have historically been limited"; and (2) "[t]here is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team." *Id.*; *accord Mansourian v. Bd. of Regents of Univ. of Cal. at Davis*, 816 F. Supp. 2d 869, 889 n.18, 927 (E.D. Cal. 2011) (on remand from the Ninth Circuit, the district court (in dicta) concluded that the university "was not required to provide a separate women's wrestling team *because* the undisputed evidence demonstrate[d] that there was not a reasonable expectation of intercollegiate competition for such a team." (emphasis added)). The 1979 Interpretation's Contact Sports Clause's plain text is not inconsistent with the regulation's Separate Teams Provision. By disregarding the plain text, the district court erred in its analysis.

### III. Conclusion

Ultimately, we conclude that the district court's primary reasons for dismissing the complaint rested on an incorrect view of the law, as discussed above.[6] *See*

---

[6]Even aside from the merits, the procedural posture of the case sinks the district court's conclusion that the athletes could only satisfy Rule 12(b)(6) by pleading their

*Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 957 (8th Cir. 2012) ("[We] review[] for abuse of discretion the denial of the motion to amend the complaint but review[] de novo the underlying legal conclusion whether the proposed amendments to the complaint would have been futile."); *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) ("Denial of a motion for leave to amend on the basis of futility 'means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6)[.]'" (internal citation omitted)). It appears that the district court saw the Contact-Sports-Clause claim as futile, not novel.[7] As such, no set of facts could have convinced the district court to

legal theory in a particular way (e.g., structured around the three-part test). *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." (citing Fed. R. Civ. P. 8)). At the pleading stage, after the athletes "informed the [University] of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim." *Id.* at 11.

Similarly, the district court improperly forced the athletes to negate an affirmative defense when it faulted the athletes for inadequately alleging that the University "did not comply with Part One of the Three-Part Test[.]" While some affirmative defenses extinguish claims at the motion-to-dismiss stage, this is not one of those times. *Cf. Humphrey v. Eureka Gardens Pub. Facility Bd.*, 891 F.3d 1079, 1081 (8th Cir. 2018) ("A court may dismiss a claim under Rule 12(b)(6) as barred by the statute of limitations if the complaint itself establishes that the claim is time-barred."); *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 763–64 (8th Cir. 2012) ("[T]he complaint, with its attachments, provided sufficient bases for a res judicata defense on a motion to dismiss.").

[7]Four circuits have cautioned against Rule 12(b)(6) dismissals when, as here, complaints include novel legal theories. *See Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (collecting cases from the First, Second, and Ninth circuits); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2020) ("The district court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or even

give the athletes a second look. But given a level playing field, or in this case, a properly smoothed ice rink, the athletes may be able to state an actionable Title IX claim.

On remand, we leave it to the district court to apply the law to the athletes' complaint in the first instance.

For these reasons, we reverse and remand the case to the district court for further consideration in light of this opinion.

STRAS, Circuit Judge, concurring.

Even when an administrative agency speaks clearly, concerns about judicial deference are not in short supply. *See Voigt v. Coyote Creek Mining Co.*, 980 F.3d 1191, 1203–04 (8th Cir. 2020) (Stras, J., dissenting) (discussing some of the problems with deferring to an administrative agency's interpretation of federal law), *reh'g granted and opinion vacated* (Dec. 30, 2020). Those concerns only grow more pronounced when an agency's efforts create a multi-layered web of regulations, interpretations, clarifications of interpretations, and even clarifications of clarifications. The focus shifts from the facts and the statutory text to debates about what line from what document supplies the relevant legal test. The agency's repeated efforts at clarity in this case have only given way to a fine mess. *See Cohen v. Brown Univ.*, 991 F.2d 888, 891 (1st Cir. 1993) (describing "Title IX's rugged legal terrain").

Title IX says that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

'extreme,' since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.").

-14-

education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Congress tasked an agency with explaining how this language applies in the context of intercollegiate athletics. *See* Education Amendments of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484, 612.

The agency began with a broad implementing regulation, which was "written at a high level of abstraction." *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1047 (8th Cir. 2002); *see* 45 C.F.R. § 86.41; *see also* 34 C.F.R. § 106.41. Then, just a few years later, it changed course and created an exceedingly detailed ten-page policy interpretation. *See* Title IX of the Education Amendments of 1972: A Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979). When confusion arose over how to apply what has come to be known as the "three-part test," *see ante* at 7, the agency attempted to clear things up in a series of four clarifications. *See* U.S. Dep't of Educ., Off. for C.R., OCR-00016, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996); U.S. Dep't of Educ., Off. for C.R., Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance (July 11, 2003); U.S. Dep't of Educ., Off. for C.R., Additional Clarification of Intercollegiate Athletics Policy: Three-Part Test—Part Three (Mar. 17, 2005); Letter from Russlynn Ali, Assistant Sec'y for C.R., U.S. Dep't of Educ. (Apr. 20, 2010) (withdrawing the 2005 clarification).

We are now swimming in a sea of deference. The regulation is entitled to *Chevron* deference, *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the policy interpretation to *Auer* deference, *see Auer v. Robbins*, 519 U.S. 452 (1997); *Chalenor*, 291 F.3d at 1047, and the clarifications to "respect," *see Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). In fact, we have already held that the policy interpretation is "controlling." *Chalenor*, 291 F.3d at 1047. What gets buried under these layers of deference may well be the statute itself.

Nevertheless, I join the court's opinion because, if we are to take *Chalenor* seriously, we have to read the policy interpretation as a whole, not just zero in on one part of it. *See United States v. Am. Coll. of Physicians*, 475 U.S. 834, 842 (1986) (reading a set of regulations "as a whole"); *Benitez-Pons v. Puerto Rico*, 136 F.3d 54, 63 (1st Cir. 1998) (explaining that "regulations must be read as a whole, and cannot be read selectively"). We can only assume, in other words, that the agency did not go to the trouble of constructing a ten-page document only to have a few lines of it—those devoted to the three-part test—mean anything. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) ("[W]e have cautioned against reading a text in a way that makes part of it redundant."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) (explaining that "every word and every provision is to be given effect"). Even though no one should mistake the policy interpretation for a statute, its text leaves no doubt that the contact-sports provision applies in these circumstances, *see* 44 Fed. Reg. at 71,418; it is consistent with the regulation, *see* 34 C.F.R. § 106.41; and none of the later agency documents say anything that calls either conclusion into question. *Cf. Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 274 (6th Cir. 1994) (applying the policy interpretation's rules for non-contact sports).

COLLOTON, Circuit Judge, concurring in the judgment.

I do not join the majority opinion, but I concur in the judgment that the district court's dismissal of the complaint cannot be sustained at this juncture. The conclusion comes reluctantly, however, because guidance from the Department of Education over the last twenty-five years could have led a reasonable university administration to believe that if it met the Department's so-called "three-part test," and provided appropriate competitive opportunities for men and women, then the institution had "effectively accommodated" the interests and abilities of members of both sexes within the meaning of 34 C.F.R. § 106.41(c)(1).

The plaintiffs allege that the University violated Title IX by discontinuing the women's ice hockey program. They rely on a "policy interpretation" issued by the Department of Education in 1979. Title IX of the Education Amendments of 1972: A Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979) ("1979 Policy Interpretation"). The interpretation addressed a rule providing that a university's selection of sports and levels of competition must "effectively accommodate" the interests and abilities of members of both sexes. 34 C.F.R. § 106.41(c)(1). The Department's policy interpretation included a clause stating that "if an institution sponsors a team for members of one sex in a contact sport, it must do so for members of the other sex," if opportunities for the excluded sex have historically been limited, and there is sufficient interest among members of that sex to field a team and a reasonable expectation of intercollegiate competition. 1979 Policy Interpretation, § VII(C)(4)(a). On that basis, say the plaintiffs, the University "must" sponsor a team in women's ice hockey.

This 1979 separate-teams mandate has largely disappeared from public view since it was issued. No court has relied on the mandate to find liability under Title IX. Neither the complaint nor the parties on appeal point to any instance in which the government has enforced the separate-teams mandate. According to the University, the Department's Office for Civil Rights (OCR) investigated a complaint that discontinuation of the women's ice hockey program violated Title IX, but closed its investigation without alleging a violation. By contrast, the Department repeatedly has addressed how an institution may comply with obligations under Title IX by meeting the Department's three-part test.[8]

---

[8]A section of the 1979 Interpretation concerning "Effective Accommodation of Student Interests and Abilities" included the following passage:

> In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and

-17-

In 1996, the Assistant Secretary for Civil Rights issued a clarification of the Department's regulatory interpretation. Dep't of Educ., Off. for C.R., Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996). The 1996 Clarification described two matters that OCR will consider in determining whether an institution complies with the "effective accommodation" requirement of § 106.41(c): (1) the three-part test, which OCR uses "to assess whether the institution is providing nondiscriminatory participation opportunities," and (2) "the quality of competition offered to members of both sexes." *Id*. at 5. The 1979 Interpretation's separate-teams mandate was not mentioned. The 1996 Clarification, adverting to 34

---

for athletes of each sex to have competitive team schedules which equally reflect their abilities.

a. Compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

1979 Policy Interpretation, § VII(C)(5). These three ways of assessing equal opportunity came to be known as the "three-part test."

C.F.R. § 106.41(c)(2)-(10), advised that OCR would consider many other factors—including coaching, equipment, practice and competitive facilities, recruitment, scheduling of games, and publicity—to make an overall determination about whether an institution is in compliance with Title IX. But with respect to "effective accommodation" under § 106.41(c)(1), the 1996 Clarification mentioned only two factors: the three-part test and quality of competition.

In 2003, the Assistant Secretary for Civil Rights issued a further clarification, explaining that in the 1979 Policy Interpretation, "the Department established a three-prong test for compliance with Title IX, which it later amplified and clarified in its 1996 Clarification." Dep't of Educ., Off. for C.R., Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance (July 11, 2003), at 2. According to the 2003 Clarification:

> The test provides that an institution is in compliance if 1) the intercollegiate-level participation opportunities for male and female students at the institution are 'substantially proportionate' to their respective full-time undergraduate enrollments, 2) the institution has a 'history and continuing practice of program expansion' for the underrepresented sex, or 3) the institution is 'fully and effectively' accommodating the interests and abilities of the underrepresented sex.

*Id.*

The most recent clarification, issued by the Assistant Secretary for Civil Rights in 2010, again suggested a two-pronged inquiry into whether an institution meets the requirement of "effective accommodation" under § 106.41(c)(1):

> The 1979 Policy Interpretation sets out a three-part test that OCR uses to assess whether an institution is effectively accommodating the athletic interests and abilities of its students to the extent necessary to provide equal athletic opportunity. As discussed in the 1979 Policy

Interpretation, OCR also considers the quality of competitive opportunities offered to members of both sexes in determining whether an institution effectively accommodates the athletic interests and abilities of its students.

Letter from Russlynn Ali, Assistant Sec'y for C.R., U.S. Dep't of Educ. (Apr. 20, 2010), at 2 & n.9. The 2010 Clarification also did not mention the 1979 Interpretation's separate-teams mandate in its discussion of "effective accommodation."

The plaintiffs in this case do not allege that the University failed to satisfy the three-part test or that the quality of competition for men's and women's teams was unequal. The district court's conclusion that the plaintiffs failed to state a claim is therefore understandable. But while those circumstances ultimately might lead the University to prevail, careful consideration requires a determination that they are not sufficient to justify dismissal of the complaint at this stage. The regulation is not clear enough to say that the separate-teams mandate is invalid, and the record is not developed enough to conclude that the Department has abandoned the separate-teams mandate as a matter of regulatory interpretation. The University may have a meritorious defense based on lack of fair notice and due process, but such a defense would not support dismissal at this stage for failure to state a claim.

The University argues with some force that the separate-teams mandate is not a valid interpretation that is entitled to deference under the doctrine of *Auer v. Robbins*, 519 U.S. 452 (1997), as a reasonable interpretation of an ambiguous regulation. I believe the majority is incorrect that *Chalenor v. University of North Dakota*, 291 F.3d 1042 (8th Cir. 2002), "directs us to give controlling deference to the entire 1979 Interpretation," *ante*, at 4 n.3, 9, including the separate-teams mandate. *Chalenor* addressed only the reasonableness of the three-part test. 291 F.3d at 1047. Even more to the point, *Chalenor* included an express disclaimer that the

decision did not address the validity of the 1979 Policy Interpretation, saying that the issue of validity must "await another day." *Id*.

The University rightly points out that one premise of § 106.41(b), regulating separate teams, is that an institution permissibly "operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex."  34 C.F.R. § 106.41(b).  In that situation, the institution must allow women to try-out for the men's team, unless the sport involved is a contact sport like ice hockey, in which case no try-outs are required.  And the specific regulatory provision on "separate teams" imposes no obligation to sponsor separate teams, while the 1979 Interpretation relies on a general requirement of "effective accommodation" in § 106.41(c)(1) to mandate the sponsorship of separate teams.  A general provision should not swallow a specific one and render it superfluous. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

After exhausting all the traditional tools of construction, however, the University's position on this point is not strong enough to establish that the only reasonable construction of "effective accommodation" would exclude the separate-teams mandate. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).  The 1979 Interpretation of § 106.41(c)(1) limits the scope of § 106.41(b), but does not render the separate teams regulation of § 106.41(b) superfluous.  Subsection (b) still regulates how an institution must proceed when all predicates for the 1979 Interpretation's separate-teams mandate are not satisfied—for example, when there are not enough women to field a team or when there is no reasonable expectation that a women's team could find intercollegiate competition.  1979 Policy Interpretation, § VII(C)(4)(a)(2).

It is also noteworthy that when the Title IX regulations were promulgated in 1975, the Department of Health, Education, and Welfare explained that the "separate teams" regulation of subsection (b) "does not alter" the responsibility of an institution

-21-

under subsection (c) to provide equal opportunity. Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,128, 24,134 (June 4, 1975) (to be codified at 45 C.F.R. pt. 86; now codified at 34 C.F.R. pt. 106). The Department thus provided that under subsection (c), "an institution would be required to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and abilities of members of both sexes.'" *Id*. This is not to say that a separate-teams mandate for every sport as suggested by the 1979 Interpretation is required by the ambiguous regulation. The three-part test itself may as a practical matter require an institution to provide some separate teams in order to meet the test. But the agency's 1975 explanation does tend to show that the regulation of separate teams under subsection (b) does not preclude the 1979 interpretation of subsection (c)(1). *See generally Halo v. Yale Health Plan*, 819 F.3d 42, 52-53 (2d Cir. 2016).

The University also makes a substantial argument based on the 1996, 2003, and 2010 Clarifications issued by the Department of Education. These clarifications represent authoritative interpretations of an ambiguous rule that are entitled to deference from the court. Each clarification was signed by an Assistant Secretary for Civil Rights, a presidential appointee who is "understood to make authoritative policy in the relevant context." *Kisor*, 139 S. Ct. at 2416. Each pronouncement was issued for the purpose of communicating the Department's official position to institutions governed by Title IX. The regulatory language is "written at a high level of abstraction and, as a result, is ambiguous," and the clarifications are reasonable, so they should be considered controlling by the court. *Chalenor*, 291 F.3d at 1047; *see Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 96-97 (2d Cir. 2012) (concluding that the 1996 Clarification is controlling); *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 n.9 (9th Cir. 2010) (same, citing *Chalenor*). The majority would merely "assume" that it should "respect" the agency's clarifications under the rule of *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), giving them deference "only to

the extent that" they have "the power to persuade." *Ante*, at 7. But it would be error to accord the agency's authoritative clarifications the treatment urged by the separate opinions in *Kisor*, rather than the status dictated by the opinion of the Court. 139 S. Ct. at 2415 n.4. It is not this court's place to fight a rear-guard action against the *Auer* doctrine.

Even so, it is not clear at this point whether the Department has authoritatively abandoned the separate-teams mandate from the 1979 Interpretation. There are indications to that effect. The 1996 and 2010 Clarifications identify only two inquiries directed to the "effective accommodation" requirement of § 106.41(c)(1)—the three-part test and quality of competition. An Investigator's Manual issued in 1990 to guide OCR investigators points in a similar direction. The Manual explains that "[t]he basic determination for this program component relies on a two part analysis; in effect, the investigation involves obtaining and analyzing information regarding: 1) equal opportunities to compete, and 2) levels of competition," where "equal opportunities to compete" turns on the three-part test, and "levels of competition" involves inquiry into competitive team schedules. Off. for C.R., Dep't of Educ., *Title IX Athletics Investigator's Manual* (1990), https://eric.ed.gov/?id=ED400763, at 21-22. But the Investigator's Manual also acknowledges the 1979 separate-teams mandate under the heading of "Cautions," *id.* at 26-27, and the 1996 and 2010 Clarifications do not necessarily renounce the separate-teams mandate by omission.

The Department has not yet filed a brief or affidavit in this case that would shed light on the vitality of its 1979 Interpretation concerning separate teams. *See Auer*, 519 U.S. at 462. (Of course, a brief endorsing the entire 1979 Interpretation, or studied silence in response to an invitation, also would require the Department to accept accountability for the consequences of requiring an institution to sponsor high-dollar programs like women's ice hockey, women's football, or women's baseball, at the potential expense of other women's teams like swimming, rowing, gymnastics,

softball, or volleyball.) Nor has the University yet presented evidence about OCR's inquiry into the discontinuation of the women's ice hockey program. If it turns out that the Department were to abandon the separate-teams mandate, and clarify definitively that the "effective accommodation" inquiry is limited to the three-part test and quality of competition, then that would change the complexion of this case. Or if the Department retains the separate-teams mandate "on paper" in a 43-year-old policy interpretation, but as a practical matter does not enforce the mandate, then there may be a serious question about whether the mandate is really a valid regulatory interpretation that provides a basis for civil liability or attorney's fees in private litigation brought under an implied right of action.

Even if it ends up that the 1979 separate-teams mandate is a current and reasonable interpretation of § 106.41(c)(1), there is also a question of fair notice to the University. If the agency's public pronouncements and enforcement activity have muddied the waters to the point where an institution is unable to identify the rules with "ascertainable certainty," then the University may have a defense to liability and attorney's fees based on due process. *See Wis. Res. Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 708-09 (7th Cir. 2013); *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1328-31 (D.C. Cir. 1995). But such a defense would not establish at this point that the plaintiffs' complaint fails to state a claim.

For these reasons, I conclude that the failure of the plaintiffs to plead a shortcoming by the University under the three-part test or on quality of competitive opportunities is insufficient reason at this juncture to dismiss the complaint. I therefore concur in the judgment reversing the district court's judgment and remanding for further proceedings.

_____