# United States Court of Appeals
## For the Eighth Circuit

_____

### Nos. 19-2921, 20-1366
_____

Alexie Portz; Jill Kedrowski; Abigail Kantor; Marilia Roque Diversi; Fernanda Quintino dos Santos; Maria Hauer; Haley Bock; Kaitlyn Babich; Anna Lindell; Kiersten Rohde, individually and on behalf of all those similarly situated

*Plaintiffs - Appellees*

v.

St. Cloud State University; Minnesota State Colleges and Universities

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 20, 2020
Filed: October 28, 2021

_____

Before COLLOTON, GRASZ, and STRAS, Circuit Judges.

_____

GRASZ, Circuit Judge.

Faced with a budget crisis in 2016, St. Cloud State University shut down six of its sports teams—including the women's tennis and Nordic skiing teams. Several female student-athletes from the disbanded teams sued the University in a class action alleging gender discrimination in violation of Title IX of the Education Amendments Act of 1972.

After a bench trial, the district court ruled for the athletes. It held that the University violated Title IX by failing to provide equal athletic-participation opportunities and failing to provide equal treatment and distribution of benefits. The University now appeals that ruling. We affirm in part and reverse in part.

## I. Background

As a state university that receives federal financial assistance, Title IX's requirements apply to the University. In the 2015–16 academic year, the University sponsored twenty-three sports teams, including twelve women's teams and eleven men's teams. Of the University's twenty-three teams, two were National Collegiate Athletics Association ("NCAA") Division I teams (men's and women's hockey); the rest were Division II teams. The district court also found that the school organizes its teams into three "tiers" and that it offers different levels of financial support for each tier.[1]

Before the 2016–17 academic year started, the University faced a budget crisis after its enrollment declined. The Athletic Department responded by cutting six sports teams: (1) women's tennis; (2) women's Nordic skiing; (3) men's tennis; (4) men's indoor track and field; (5) men's outdoor track and field; and (6) men's cross country. In an attempt to comply with Title IX, the University also implemented a roster-management plan. That plan decreased the rosters for several men's teams while increasing the rosters for several women's teams.

---

[1]Tier one, as found by the district court, includes men's hockey, women's hockey, men's basketball, women's basketball, men's football, and women's volleyball. Tier two includes baseball, softball, women's soccer, men's swimming and diving, women's swimming and diving, men's track and field, women's track and field, and wrestling. Tier three includes men's cross country, women's cross country, women's Nordic skiing, men's golf, women's golf, men's tennis, and women's tennis. The University contests the district court's finding that the University separates its teams into three tiers and the court's use of the three-tier system in its legal analysis.

Ten female student-athletes—all recent members of the women's tennis or Nordic skiing teams when the cuts were announced—brought a class action against the University and the Minnesota State Colleges and Universities system (the state's governing body for public institutions of higher learning) alleging Title IX violations.

The district court preliminarily enjoined the University from cutting the women's tennis and Nordic skiing teams. It then certified a class and dismissed the athletes' non-Title-IX claims. After a bench trial, the district court ruled for the athletes, holding that the University failed to comply with Title IX requirements in its allocation of athletic participation opportunities and treatment and benefits for student-athletes. The district court issued declaratory relief to the athletes and ordered the University to take immediate steps to give its female student-athletes equitable participation opportunities and equitable treatment and benefits. The district court also awarded attorney fees and costs to the athletes totaling more than one million dollars.

## II. Analysis

"After a bench trial, we review the district court's legal conclusions de novo and its factual findings for clear error." *Lawn Managers, Inc. v. Progressive Lawn Managers, Inc.*, 959 F.3d 903, 908 (8th Cir. 2020). We review the district court's grant of a permanent injunction and its evidentiary rulings for abuse of discretion. *Miller v. Thurston*, 967 F.3d 727, 735 (8th Cir. 2020) ("A district court abuses its discretion by resting its decision on clearly erroneous factual findings or an erroneous legal conclusion."); *Holmes v. Slay*, 895 F.3d 993, 998–99 (8th Cir. 2018) (noting that we will only reverse an evidentiary ruling "if there was a clear and prejudicial abuse of discretion" (quoting *Der v. Connolly*, 666 F.3d 1120, 1130 (8th Cir. 2012))).

## A. Title IX Background

Under Title IX, "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal assistance[.]"  20 U.S.C. § 1681(a) (emphasis added).  In short, the statute bars federally funded educational institutions "from engaging in sex-based discrimination." *See Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1044 (8th Cir. 2002).

The Department of Health, Education, and Welfare ("HEW")[2] promulgated a regulation implementing Title IX in 1975.  *Id.* at 1045; *see McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286–93, 290 (2d Cir. 2004) (recounting the details of Title IX's passage and implementation).  That regulation gives ten factors for the agency to consider in determining if an institution "provid[es] equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c) (2020) (ED regulation); 45 C.F.R. § 86.41(c) (2020) (HHS regulation).  The first factor requires "effective[] accommodat[ion]" of the interests and abilities for both sexes (i.e., equitable participation opportunities).  34 C.F.R. § 106.41(c)(1).  To determine whether the athletic programs are providing equitable treatment and benefits to their male and female athletes, courts look to the other nine factors.  *See McCormick*, 370 F.3d at 291 ("Title IX claims alleging that a school provides unequal benefits and opportunities to its male and female athletes are generally referred to as 'equal treatment' claims and derive from factors two through ten of the regulations." (quoting *Boucher v. Syracuse Univ.*, 164 F.3d 113, 115 n.2 (2d Cir. 1999))).  Those factors—sometimes known as the laundry list—are (2) provision of equipment and supplies; (3) scheduling of games and practice time; (4) travel and per diem allowance; (5) opportunity to receive coaching and academic tutoring; (6) assignment and compensation of coaches and tutors; (7) provision of locker rooms, practice, and competitive facilities; (8) provision of medical and training

---

[2]The Department of Education and the Department of Health and Human Services have since succeeded the Department of Health, Education, and Welfare and have each promulgated identical versions of HEW's original regulation.

facilities and services; (9) provision of housing, dining facilities, and services; and (10) publicity. 34 C.F.R. § 106.41(c)(2)-(10).

Title IX challenges usually fall into two groups: (1) participation-opportunities challenges (governed by factor one) and (2) treatment-and-benefits challenges (governed by factors two through ten). This case involves both.

To clarify the meaning of its original regulation, HEW issued a policy interpretation in 1979. *See* 44 Fed. Reg. 71413–71423 (1979) (the "Interpretation"); *see also Chalenor*, 291 F.3d at 1047 (concluding that we owe "controlling deference" to the Interpretation). The Interpretation offers more guidance about what constitutes a participation-opportunities violation and a treatment-and-benefits violation.

To survive a participation-opportunities challenge under § VII.C.5(a) of the Interpretation—and show effective accommodation under factor one—athletic programs must meet one of three standards, known as the "three-part test."[3] 44 Fed. Reg. at 71418. Courts refer to the three standards in the three-part test as Prongs One, Two, and Three.

The three-part test gives institutions "three individual avenues to choose from" to comply with Title IX's requirements that participation opportunities be offered to both sexes in an equal manner. *See Chalenor*, 291 F.3d at 1045–46 (quoting Department of Education, Office for Civil Rights, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996)). Prong One requires that the "participation opportunities" provided to male and

---

[3]Beyond the three-part test (§ VII.C.5(a)), "effective accommodation" under the Levels of Competition provision (§ VII.C.5) also requires that programs meet the levels-of-competition test (§ VII.C.5(b)). 44 Fed. Reg. at 71418. Here, the district court ruled that the University met the levels-of-competition test, and the athletes did not cross appeal, so this issue is not before us. *See Duit Constr. Co. v. Bennett*, 796 F.3d 938, 941 (8th Cir. 2015).

female students be "*substantially proportionate*" in numbers "to their respective enrollments." *Id.* (emphasis added). Prong Two requires a "*history and continuing practice* of program expansion" "responsive to the developing interests and abilities of the members of that sex." *Id.* (emphasis added). Prong Three requires that the "present program" has "*fully and effectively accommodated*" "the interests and abilities of the members of that sex." *Id.* (emphasis added).

The Interpretation also offers guidance on how to evaluate a treatment-and-benefits challenge under § VII.B. Under the heading "Overall Determination of Compliance" within § VII.B.5, the Interpretation lays out three ways to determine if an institution is complying with § VII.B of the regulation by providing equitable treatment and benefits to its athletes:

> a. Whether the policies of an institution are discriminatory in language or effect; *or*
>
> b. Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes *in the institution's program as a whole*; *or*
>
> c. Whether disparities in benefits, treatment, services, or opportunities *in individual segments of the program* are substantial enough in and of themselves to deny equality of athletic opportunities.

44 Fed. Reg. at 71417 (emphasis added). Under the emphasized language's unambiguous text, in evaluating a program's distribution of treatment and benefits, a court may find a program-wide violation (global) when "substantial and unjustified" disparities exist. The text also allows a court to find a violation where disparities in "individual segments of the program" (i.e., a specific laundry list factor) "are substantial enough in and of themselves" to deny "equality of athletic opportunities." *See Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 919–20 (7th Cir. 2012) (discussing how disparities within an "individual segment[] of the program"—in that case the "scheduling" laundry list factor—may violate Title IX (quoting 44 Fed. Reg. at 71417)); *see also McCormick*, 370 F.3d at 292–93 (calling

the laundry list factors "program components" and discussing how "a disparity in one program component . . . can alone constitute a Title IX violation").

The Interpretation also "contemplates that a disparity [in a program's distribution of treatment and benefits] disadvantaging one sex in one part of a school's athletics program can be offset by a comparable advantage to that sex in another area." *Id.* at 293; *see* 44 Fed. Reg. at 71415 ("Institutions will be in compliance [under § VII.B.2] if the compared program components are equivalent, that is equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the *overall effect* of any differences is negligible." (emphasis added)). And even if "comparisons of program components reveal" that treatment, benefits, and opportunities "are not equivalent in kind, quality, or availability," the agency may still deem institutions compliant if "the differences are the result of nondiscriminatory factors" such as "unique aspects of particular sports" or "legitimately sex-neutral factors related to special circumstances of a temporary nature." *Id.* at 71415–16.

### B.  The Tiers Finding

The University first challenges the district court's factual finding that the University operates its athletic program according to tiers and that it allocates benefits based on such a system. It argues that this finding is clearly erroneous. We disagree.

The district court found that the University "organizes its intercollegiate sports into three tiers offering three different levels of support to each tier." At least two University-specific pieces of evidence support this conclusion. First, trial testimony from the University's Title IX compliance officer indicates that the school's Gender Equity Advisory Committee discussed the three tiers for sports in the University's athletic program at a 2011 meeting. Second, the University's athletic director clearly noted the distinction during a deposition.

The University argues convincingly that the more noteworthy distinction is between its Division I teams (men's and women's hockey) and its Division II teams (all the rest). But the district court acknowledged the distinction between the divisions several times in its order. And, in any event, that distinction's existence does not preclude the existence of a separate, three-tiered rubric for dividing the teams at this particular school.

Thus, we conclude there is no clear error in the district court's finding that the University uses a tier system.

## C. Participation Opportunities

The University next argues that the district court wrongly "applied its finding of tiers in its review of the allocation of athletic participation opportunities[.]" It argues that the district court committed legal error because it allegedly used the tiers finding in its conclusion that the University did not provide equal participation opportunities.

But this argument fails before it starts. Simply put: the district court did not employ the tier finding in its participation-opportunity analysis *at all*. While the University correctly notes that the district court relied on the tiers concept in its treatment-and-benefits analysis, *see infra*, it did not rely on the tiers concept in its participation-opportunities analysis. Instead, the district court held that the University failed to comply with any prong from the three-part test. That part of the district court's holding (and its reasoning) says nothing about the tier system. [4]

---

[4]As discussed in Section II.D.1., the district court did erroneously reference tiers when fashioning its remedy related to participation opportunities, and thus the injunction must be corrected. But unlike its treatment and benefits analysis, the district court did not utilize tiers when analyzing whether the University failed to provide equal participation opportunities.

Because the University does not advance any other substantive arguments against the district court's participation-opportunity conclusions, we hold that the district court did not err in concluding that the University violated Title IX by not providing equitable participation opportunities for men and women.

## D. Treatment and Benefits

The University further argues that the district court's treatment-and-benefits analysis suffers from multiple defects. We agree that the district court erred in two meaningful ways when it conducted that analysis.

## 1. Use of Tiers

The district court concluded that the University failed to provide equitable treatment and distribution of benefits *among the tiers* of its program and that this failure violates Title IX. It began its analysis of treatment and benefits by stating:

> [The University] has three tiers of support for its sports programs. On a global level, treatment and benefits are not equitable because substantially fewer women benefited from the Tier 1 level of support than men. Tier 1 teams generally have adequate or better equipment, supplies, locker rooms, practice and competitive facilities, and medical training facilities. . . . The substantial inequity results from a disproportionate number of male athletes benefitting from the better treatment and benefits conferred on Tier 1 teams over Tier 2 and 3 teams. . . . For an institution to meet Title IX's treatment and benefits requirement when it creates different tiers of support for its teams, a substantially equivalent number of men and women should be in each tier and receive the same quality of benefits and treatment.

That paragraph reveals the district court improperly relied on the tiers finding to conclude that "[o]n a global level" the University inequitably allocated treatment and benefits between men's and women's sports. Doing so amounted to legal error.

The Interpretation states that a treatment-and-benefits analysis under § VII.B.5 involves examining disparities (1) "in the institution's program as a whole" (global analysis) and/or (2) "in individual segments of the program" (factor-by-factor analysis). 44 Fed Reg. at 71417. The global part of the treatment-and-benefits analysis calls for a holistic examination of how the University distributes treatment and benefits across the *entire* program. But the district court's global analysis was improper because it only considered parts (e.g., tiers) of the athletic program rather than "the institution's program *as a whole*." 44 Fed Reg. at 71417 (emphasis added).

The Interpretation supports the University's argument that the district court was wrong to mandate equity among the "tiers." In responding to commentators who suggested measuring equality of treatment and benefits using a "sport specific" comparison, the Interpretation states that "the regulation frames the general compliance obligations of recipients in terms of *program-wide benefits and opportunities*," as opposed to a "sport-specific comparison." *Id.* at 71422 (emphasis added); *see Parker*, 667 F.3d at 919. This logic illustrates why the district court erred in conducting the treatment-and-benefits analysis using tiers. By mandating equity "at every tier of its athletic department," the district court failed to perform the global treatment-and-benefits analysis using the proper aperture. It should have focused on "program-wide benefits and opportunities" rather than on a smaller sub-division of the program (e.g., sports, tiers of sports, etc.).

The district court's use of the tiers concept in its injunction, both as to participation opportunities and as to treatment and benefits, highlights this error. In its current form, the injunction requires the University "take immediate steps" to provide "equitable athletic-related treatment and benefits *at every tier* of its athletic department." And the injunction mandates that the University "take immediate steps toward eliminating the inequity stemming from the unequal distribution of women and men's participation opportunities among the tiers of support[.]" Right now, the injunction requires more than Title IX does and places the district court in the position of "*de facto* super-athletic department director," which is to say, outside its

-10-

properly limited judicial role by going beyond the requirements of Title IX. *Grandson v. Univ. of Minn.*, 272 F.3d 568, 573 (8th Cir. 2001).[5] We therefore conclude that the district court erred by requiring the University to provide equitable treatment and benefits "among the tiers of support," and by mandating steps toward eliminating the unequal distribution of "participation opportunities among the tiers."

## 2. Volleyball Team

Second, in conducting the treatment-and-benefits analysis, the district court made findings of fact as to each major team and the quality of its resources (e.g., facilities, equipment, coaching staff). But in making those findings, the district court failed to devote a section to the volleyball team and, consequently, did not mention any evidence related to that team in its treatment-and-benefits analysis. For example, when the district court discussed the "travel" factor, it failed to mention the volleyball team even though it is one of the few teams at the University that travels by plane. We view this as a significant omission, particularly considering women's volleyball was one of the two women's Tier I sports. The record indicates that the University has given the women's volleyball team some of the finest facilities and best resources of any of its teams. As a result, a more complete review of the evidence related to the volleyball team's treatment and benefits has the potential to impact the analysis on the treatment-and-benefits issue generally or as to specific factors from the laundry list. We therefore conclude that this significant omission of important evidence from the analysis was error. *See generally King v. United States*, 553 F.3d 1156, 1161 (8th Cir. 2009) (explaining Fed. R. Civ. P. 52(a)

---

[5]The injunction's reliance on a tier-based approach to treatment and benefits and participation opportunities fails to recognize the flexibility that Title IX affords to the University in providing equal athletic opportunity. If, for example, a collegiate sports program had predominantly men's sports teams in what was considered Tier I and III, and predominantly women's sports teams in Tier II, an analysis that failed to holistically examine the program would be faulty. The institution's athletic program as a whole could, depending on the facts, be in compliance notwithstanding disparities among or within the tiers.

requires the district court conducting a bench trial to provide sufficient findings of fact to permit review of its decision).[6]

### III. Conclusion

For these reasons, we affirm in part as to the district court's conclusion that the University did not comply with Title IX in its allocation of athletic participation opportunities. We reverse as to its conclusion regarding treatment and benefits and remand for further proceedings not inconsistent with this opinion. We vacate the injunction as it relates to treatment and benefits and to the extent it requires equity in participation opportunities among tiers rather than program wide. We also vacate the attorney fees and costs award in light of our opinion.

COLLOTON, Circuit Judge, dissenting.

I would affirm the judgment of the district court. There is no legal error in the district court's analysis. The record developed at trial amply supports the district court's finding that the University did not provide equal athletic opportunity for members of both sexes. The majority asserts two errors, but neither justifies setting aside the judgment.

---

[6]The University also contends that the district court erred in admitting as evidence the athletes' inspection of the University's property following the close of discovery because that inspection violated the discovery scheduling order and failed to comply with Federal Rule of Civil Procedure 34. We review such an evidentiary ruling for abuse of discretion, *Holmes*, 895 F.3d at 999–1000 (quoting *Der*, 666 F.3d at 1130), and will only reverse an improper evidentiary ruling if the objecting party shows that the evidentiary error was "prejudicial[.]" *Id.* While we think that allowing this evidence to come in—in violation of both a scheduling order and Rule 34—is troubling, we cannot say the district court abused its discretion because the University has failed to show it was prejudiced by the admission.

First, the majority perceives error in the district court's conclusion that "[o]n a global level, treatment and benefits are not equal because substantially fewer women benefited from the Tier 1 level of support than men." This conclusion properly considered the University's program as a whole. As the district court explained, more men than women participated in sports placed in Tier 1 and Tier 2; more women than men participated in sports in Tier 3. Yet the University provided greater support to athletic teams in Tier 1 and Tier 2, and the lowest level of support to teams in Tier 3. Considering the institution's program as a whole, the district court reached the common-sense conclusion that where the highest level of support goes to the tiers in which men are over-represented, and the lowest level of support goes to the tier in which women are over-represented, the university on a global level does not provide equal athletic opportunity for members of both sexes. The injunction properly requires that if the University elects to retain a three-tier system, then it must rectify the inequity that stems from the unequal distribution of participation opportunities among the tiers of the support. There is no legal error in this conclusion.[7]

The majority also says that the judgment cannot stand because the district court's 65-page decision did not include a more lengthy discussion of the women's volleyball program. This is not the stuff of reversible error. This court reviews judgments not opinions, and reversal is not warranted simply to require a more exhaustive opinion from the district court. The district court did not fail to resolve an important credibility question or other significant question of disputed fact. *Cf.*

---

[7]The University does not seek flexibility to adopt the majority's unlikely hypothetical tiering plan. *Ante*, at 11 n.5. The University argues instead that it should be allowed to continue allocating a greater proportion of Tier 1 participation opportunities to men while female participants remain over-represented on teams in Tier 3. Appellant's Br. 23-24. In any event, a dispute about the phrasing of the injunction would not justify setting aside the district court's well-supported finding of liability for the University's failure to provide equal treatment and benefits to women.

*King v. United States*, 553 F.3d 1156, 1161 (8th Cir. 2009). The University's brief on appeal adverted to the volleyball-related evidence only in a footnote, and consideration of that evidence does not establish that any factual finding of the district court was clearly erroneous.

The majority specifies only that the volleyball team is "one of the few teams at the University that travels by plane." The district court found that the factor of "travel and per diem expenses" favored men over women, because "men's teams are able to travel more frequently, more comfortably, and for longer periods of time, and [the University] funds more of the men's teams' expenses." R. Doc. 380, at 55. The court discussed travel by the basketball, baseball, softball, skiing, tennis, swimming, and diving teams. The record showed that the men's and women's hockey teams traveled by a combination of bus and commercial flights, that no other team traveled regularly by air, and that other teams could travel by air for a preseason contest or over spring break in the case of baseball and softball. R. Doc. 361, at 93 (Tr. 1127). Brief testimony about the volleyball team showed only that the team could travel by air for a preseason contest. *Id*. Consideration of this testimony does not establish clear error in the district court's overall finding about travel and per diem expenses.

The only other evidence about the volleyball program cited in the University's footnote concerns the locker room. The district court found that the University's provision of locker rooms, practice facilities, and competitive facilities substantially and inequitably favored male athletes. After discussing facilities for football, hockey, basketball, softball, soccer, skiing, baseball, and wrestling, the court found that "female athletes overall have lower quality locker rooms." R. Doc. 380, at 56. The evidence showed that the women's volleyball locker room was upgraded a few years ago, with wood and lockers, but it is not "full size" and is not as big as the expanded men's basketball locker room. R. Doc. 362, at 63 (Tr. 1305). Adding this evidence to the mix with nine other teams does not undermine the district court's finding as to locker rooms. Nor does it show clear error in the district court's larger finding that female athletes are not afforded equal opportunity with respect to locker rooms, practice facilities, and competitive facilities taken together.

The district court conducted a week-long bench trial that produced a transcript of nearly 1500 pages.  The court rendered a thorough decision with detailed findings of fact and lengthy conclusions of law.  The record well supports the determination that the University did not provide equal athletic opportunity for members of both sexes.  There is no need for additional findings of fact or reformulated legal conclusions.  I would affirm the judgment and the related order on attorney's fees and costs.

_____